**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

FILED

2003 OCT 31  A 10: 49

US DISTRICT COURT
BRIDGEPORT CT

|  |  |
|---|---|
| JOHN B. DeRAY, | ) |
| Plaintiff, | ) |
| v. | )  Case No. 3:02-CV-2139 (JCH) |
| RUSS LARSON, *et al.*, | ) |
| Defendants. | ) |


**DEFENDANTS INTERNATIONAL UNION OF ELEVATOR
CONSTRUCTORS, AFL-CIO AND RONALD J. KOERBEL'S
MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii

I.  Introduction ............................................................................................................ 1

II. Statement of Facts .................................................................................................. 3

    A.  General Background .......................................................................................... 3

    B.  DeRay's Employment with Otis at the Mohegan Sun Construction Project ........ 5

        1.  May or July 2001: DeRay Completes the Required Safety
            Training Program and Acknowledges the Safety Policy
            Regarding "Fall Protection" ......................................................................... 5

        2.  July to September 2001: DeRay Works at the Mohegan Sun
            Project, But Does Not Wear the Safety Harness at all Times
            While Working on the Site ........................................................................... 6

        3.  September to November 26, 2001: Supervisor Russ Larson
            Instructs DeRay to Wear the Safety Harness But DeRay Does
            Not Comply With the Instruction Until Asked by the IUEC
            Local 91 Business Manager ........................................................................ 7

        4.  November 27 to December 10, 2001: DeRay's Confrontation
            with Supervisor Larson and DeRay's Refusal to Wear the
            Safety Harness ............................................................................................ 8

        5.  December 10, 2001: DeRay Fails to Follow the Grievance and
            Arbitration Procedure in the Otis Agreement ........................................... 10

            a.  The Grievance and Arbitration Procedure ..................................... 10

            b.  DeRay's December 10, 2001 "Grievance" ..................................... 12

        6.  December 11, 2001 to February 5, 2002: DeRay Continues
            to Refuse to Wear a Safety Harness Despite Otis Directives ................. 14

        7.  February 6, 2002: Otis Terminates DeRay for Refusing to
            Comply with the Safety Policy Regarding the Wearing of
            Safety Harnesses ....................................................................................... 15

        8.  February 12, 2002: DeRay Fails to Comply with the Grievance
            Procedure for a Second Time ................................................................... 15

C.    Events After DeRay's Termination from Otis ..................................................... 16

    1.    February 22, 2002:  DeRay Drafts a Letter Threatening to Sue ............. 16

    2.    March 14, 2003:  The Meeting with Otis ................................................ 16

    3.    May 23, 2002:  The Meeting at IUEC Local 91's Offices ...................... 17

    4.    December 4, 2002:  DeRay Files the Complaint in this Case ................. 18

III.    Summary Judgment Standard ...................................................................................... 18

IV.    Argument .................................................................................................................... 19

A.    Defendant Koerbel is Entitled to Summary Judgment as an Action Against
Koerbel Cannot be Maintained Under Section 301 ........................................... 20

B.    Defendant IUEC is Entitled to Summary Judgment Because Plaintiff
DeRay Cannot Establish that the IUEC Acted Arbitrarily, Discriminatorily
or in Bad Faith With Respect to DeRay's Alleged "Grievances" ...................... 21

    1.    The Standard Governing the Duty of Fair Representation ..................... 21

    2.    Plaintiff DeRay's Allegations Against the IUEC are Barred by
the Six Months Statute of Limitations Governing Section 301
Actions ................................................................................................... 24

    3.    Defendant IUEC Did *Not* Act Arbitrarily, Discriminatorily or in
Bad Faith With Respect to Plaintiff DeRay's Two "Grievances" .......... 27

        a.    The IUEC Did Not Act Arbitrarily With Regard to
DeRay's Two Alleged "Grievances" ........................................... 27

        b.    There is No Evidence to Support any Conclusion that
the Union Acted Discriminatorily or in Bad Faith ...................... 31

V.    Conclusion .................................................................................................................. 32

109895_1.DOC

## TABLE OF AUTHORITIES

### CASES

*Air Line Pilots Association v. O'Neill,*
499 U.S. 65 (1991)................................................................................................27

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986)..............................................................................................19

*Baker v. Interstate Brands Corp. d/b/a Dolly Madison Cake Co.,*
801 F. Supp. 856 (D. Kan. 1992)..........................................................................31

*Bergeron v. Henderson,*
52 F. Supp. 2d 149 (D. Me. 1999)........................................................................19

*Ciambriello v. County of Nassau,*
292 F.3d 307 (2d Cir. 2002)..................................................................................19

*Cohen v. Flushing Hospital & Medical Ctr.,*
68 F.3d 64 (2d Cir. 1995).........................................................................24, 25, 26

*Covello v. Depository Trust Co.,*
88 F. Supp. 2d 59 (E.D.N.Y. 2000) .................................................................20, 21

*Crider v. Spectrulite Consortium,*
130 F.3d 1238 (7th Cir. 1997) ......................................................................28, 29, 30

*Daniels v. Anheuser-Busch, Inc.,*
No. 96-CV-1518, 1997 U.S. Dist. LEXIS 13060 (N.D.N.Y. Aug. 27, 1997) .........................20, 21

*DeCrosta v. National Post Office Mail Handlers,*
No. 90-CV-1269, 1994 U.S. Dist. LEXIS 6017 (N.D.N.Y. May 4, 1994)....................................30

*DeRay v. Larson,*
No. 3:02-CV-2139 (JCH) (D. Conn.) Sept. 16, 2003.....................................1, 19, 20, 21

*DelCostello v. International Brotherhood of Teamsters,*
462 U.S. 151 (1983)..............................................................................................24

*Erhard v. Local Union No. 604,*
914 F. Supp. 954 (W.D.N.Y. 1996)........................................................................20

*Flanigan v. Truck Drivers Local No. 671,*
942 F.2d 824 (2d Cir. 1991)..................................................................................20

*Ghartey v. St. John's Queens Hospital,*
869 F.2d 160 (2d Cir. 1989)..................................................................................24

*Ghartney v. Saint John's Queens Hospital,*
727 F. Supp. 795 (E.D.N.Y. 1989) ......................................................................................20

*Hines v. Anchor Motor Freight, Inc.,*
424 U.S. 554 (1976)...........................................................................................................22

*International Brotherhood of Electric Workers v. Foust,*
442 U.S. 42 (1979)..............................................................................................................20

*Joseph v. Local UAW 1097 Union,*
917 F. Supp. 188 (W.D.N.Y. 1996) ...........................................................................26, 27, 31

*Lin v. New York City Admin. for Children's Svcs.,*
No. 99-Civ. 10314 (LAP), 2003 U.S. Dist. LEXIS 14264 (S.D.N.Y. Aug, 21, 2003)..................18

*Marquez v. Screen Actors Guild,*
525 U.S. 33 (1998)..........................................................................................................21, 27

*Matsushita Electric Industrial Co., LTD v. Zenith Radio Corp.,*
475 U.S. 574 (1986)........................................................................................................18, 19

*Morris v. Local 819, International Brotherhood of Teamsters,*
169 F.3d 782 (2d Cir. 1999)............................................................................................20, 21

*Murphy v. Air Transport Local 501,*
123 F. Supp. 2d 55 (D. Conn. 2000) .............................................................................18, 22, 23

*Renfro v. Interstate Brands Corp. d/b/a Dolly Madison Cake Co.,*
879 F. Supp. 1582 (D. Kan. 1995) ......................................................................................31

*Rennie v. Glass, Molders, Pottery Plastics & Allied Workers International Union,*
38 F. Supp. 2d 209 (D. Conn. 1999) ...................................................................................23

*Serow v. Redco Foods, Inc.,*
187 F. Supp. 2d 47 (N.D.N.Y. 2002)...................................................................................23

*United Steelworkers of America v. Rawson,*
495 U.S. 362 (1990)..........................................................................................................22

*Vaca v. Sipes,*
386 U.S. 171 (1967)...................................................................................................20, 22, 23

*Vargas v. Hill,*
152 F. Supp. 2d 315 (S.D.N.Y. 2001)...........................................................................22, 23, 31

*White v. White Rose Food,*
237 F.3d 174 (2d Cir. 2001)...............................................................................................22

## STATUTES

42 U.S.C. § 1983 ................................................................................................................19

29 U.S.C. § 160(b) .............................................................................................................24

## MISCELLANEOUS

Fed. R. Civ. P. 56(c) ..........................................................................................................18

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| | ) | |
| JOHN B. DeRAY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:02-CV-2139 (JCH) |
| | ) | |
| RUSS LARSON, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### DEFENDANTS INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, AFL-CIO AND RONALD J. KOERBEL'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants International Union of Elevator Constructors, AFL-CIO ("IUEC") and Ronald J. Koerbel ("Koerbel") respectfully submit this Memorandum in Support of their Motion for Summary Judgment.

### I.      INTRODUCTION

In its September 16, 2003 ruling, the Court dismissed the claims of pro se Plaintiff John B. DeRay ("DeRay") against Defendants Russ Larson, Jeff Hastings and Earnest Lowe. *DeRay v. Larson*, No. 3:02-CV-2139 (JCH), slip op. at 1, 10 (D. Conn. Sept. 16, 2003). In that ruling, the Court addressed DeRay's claims under the framework of a "hybrid" claim under Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). A "hybrid" claim is one that alleges that an employer breached a collective bargaining agreement and a union breaches its duty of fair representation. *DeRay*, slip op. at 4-6. Finding that Larson, Hastings and Lowe could not be sued individually under Section 301, the Court dismissed DeRay's claims against those individuals, with leave to replead given DeRay's pro se status. *Id.* at 10.

Defendants IUEC and Koerbel now respectfully request that the Court grant their motion for summary judgment and dismiss DeRay's claims against them. In his complaint, Plaintiff DeRay alleges that Koerbel failed or refused to represent him as outlined in the "Otis Elevator Agreement with International Union of Elevator Constructors (Effective July 9, 1997 to July 8, 2002)" ("Otis Agreement"). DeRay is suing Koerbel for monetary damages in Koerbel's capacity as an officer of the IUEC. Accordingly, based upon its September 16 ruling and the existing case law, the Court should dismiss DeRay's claim against Koerbel.

Defendant IUEC further respectfully requests that the Court dismiss the claims against it. DeRay's allegations against the IUEC are barred by the six-month statute of limitations governing "hybrid" Section 301 claims. If the Court finds the claims are not time-barred, the IUEC respectfully submits that there are no genuine issues of material fact and that the IUEC is entitled to judgment as a matter of law. The undisputed facts establish that DeRay intentionally disregarded the safety policy of his employer, Defendant Otis Elevator Company ("Otis"), and refused to wear a safety harness while working on a construction site. DeRay ignored his supervisor's directives and his union representative's requests to wear the safety harness, insisting that he would not comply with what he viewed as an unnecessary requirement. After more than two months of DeRay's willful disobedience, Otis terminated DeRay on February 6, 2002 for his refusal to comply with safety rules.

While DeRay claims to have "filed" grievances on December 10, 2001 and February 12, 2002, he failed to comply with the grievance procedure and properly file the grievances. Once again, DeRay acted on his own, without seeking the assistance of the Union, when he filed his alleged "grievances." When the IUEC learned of DeRay's claims and his undisputed, willful refusal to comply with the safety policy, the Union determined that there was no basis for

2

proceeding with a grievance or arbitration because DeRay's dismissal was justified and any grievance on his behalf was unlikely to succeed.

Under these circumstances, there are no issues for trial with regard to whether the IUEC breached its duty of fair representation, *i.e.*, whether the IUEC acted arbitrarily, discriminatorily or in bad faith. To the contrary, the IUEC acted within the wide range of reasonableness that is accorded to labor organizations when it reasonably determined that, given the clear language of the safety policy and DeRay's undisputed refusal to comply with it, DeRay's grievance over the policy lacked merit and his discharge was for just cause. These conclusions lead to the ultimate conclusion that, based upon the undisputed facts, the IUEC is entitled to judgment as a matter of law. For these reasons, as discussed in greater detail below, Defendants IUEC and Koerbel respectfully request that the Court dismiss DeRay's allegations against them in their entirety.

## II.    STATEMENT OF FACTS[1]

### A.    General Background

Defendant International Union of Elevator Constructors, AFL-CIO ("IUEC") is a labor organization with work jurisdiction over all aspects of the installation, maintenance and repair of elevators, escalators, and related machinery. (Affidavit of Ronald J. Koerbel ("Koerbel Aff.") ¶ 3.) The IUEC represents approximately 25,000 members in local unions throughout the United States and Canada. (Koerbel Aff. ¶ 3.) One such local union is Defendant International Union of Elevator Constructors, Local 91 ("IUEC Local 91"), which maintains a principal office in New Haven, Connecticut. (*Id.*)

---

[1] The Statement of Facts is drawn from Defendant IUEC's and Koerbel's "Rule 56(a)1 Statement" that accompanies their Motion for Summary Judgment.

Defendants IUEC and IUEC Local 91 are parties to nationwide collective bargaining agreements with many elevator contractors, like Defendant Otis Elevator Company ("Otis"). (Koerbel Aff. ¶ 4.) The collective bargaining agreement between the Unions and Otis was called the "Otis Elevator Company Agreement with the International Union of Elevator Constructors (Effective July 9, 1997 to July 8, 2002)" ("Otis Agreement").   (DeRay Dep. at 18-19; Koerbel Aff. ¶ 4; Koerbel Aff. Ex. 1.) The Otis Agreement divides the work performed by employees into four basic categories: construction, repair, modernization and contract service. (Koerbel Aff. ¶ 6.  *See also* DeRay Dep. at 97-98.)   Article VII addresses construction work; Article VIII addresses repair work; Article VIII(A) addresses modernization work; and Article IX addresses contract service work.  (Koerbel Aff. ¶ 6.  *See also* Koerbel Aff. Ex. 1 at 24-44.)

The most relevant category of work in this case is construction work.  Article VII defines construction work as "erecting and assembling of apparatus as enumerated in Article IV and Article IV(A) of this Agreement."  (Koerbel Aff. Ex. 1 at 24.)  Article IV, Paragraph 1 provides, "[i]t is agreed by the parties to this Agreement that all work specified in Article IV shall be performed exclusively by Elevator Constructor Mechanics and Elevator Constructor Helpers in the employ of the Company."  (*Id.* at 4.)  Paragraph 2 contains numerous subparagraphs, from (a) to (v), listing various types of work falling within the work jurisdiction of the agreement. (*Id.* at 5-8.)  For example, subparagraph (r) provides, "[t]he operating of temporary cars." (*Id.* at 8.)

"Temporary cars" may be the cars used to erect rails and brackets of an elevator, but there may be other types of "temporary cars."  (DeRay Dep. at 99.)  Indeed, at a construction site, the actual elevators may constitute "temporary cars" because they are used temporarily to transport construction workers and material.  (Koerbel Aff. ¶ 9.)  The operation of such cars constitutes "the operating of temporary cars" under Article IV, Paragraph 2(r) of the Otis

4

Agreement. The wide variety of work listed in the subparagraphs of Paragraph 2, such as freight

handling in subparagraph (a) and operating of temporary cars in subparagraph (r), demonstrates

that the Otis Agreement defines "construction work" very broadly.

### B.    DeRay's Employment with Otis at the Mohegan Sun Construction Project

Obviously, Otis employees perform construction work at construction projects or sites;

and, in 2001, one such project/site was at the Mohegan Sun Casino resort. In May or July 2001,

Otis sent Plaintiff John B. DeRay to work at the Mohegan Sun construction project. (DeRay

Dep. at 9.) DeRay has worked in the elevator industry and has been a member of IUEC Local 91

and the IUEC for over twenty-five years. (*Id.* at 97.)

### 1.    May or July 2001: DeRay Completes the Required Safety Training Program and Acknowledges the Safety Policy Regarding "Fall Protection"

Prior to working at the Mohegan Sun construction project, Otis required DeRay to

complete safety training. (DeRay Dep. at 10.) This safety training consisted of the completion

of a computer program and watching three videos. (*Id.* at 10-11.) DeRay completed the safety

training (*id.* at 11); and, at some point early in his work at Mohegan Sun, DeRay saw a copy of

Otis' Safety Manual. (*Id.* at 14.)

The Otis Safety Manual contains a section that addresses "fall protection." Fall

protection is an important safety issue in the elevator industry, in which employees frequently

work near or in open elevator shafts. The subject matter of "fall protection" includes the

precautions and instructions for employees with regard to use of certain types of safety

equipment, such as a safety harness. A safety harness is a set of straps that go between the legs,

around the stomach, over the shoulders and across the chest. (*See, e.g.,* DeRay Dep. at 20-21

(describing harness); DeRay Dep. Ex. 3 at 51 (showing picture of harness).) The safety harness

has a ring on the back where the employee would hook the lanyard. (DeRay Dep. at 20-21.)

Otis not only had safety harnesses, but also "fall protection uniforms," which were basically a pair of overalls with a safety harness built into it.  (*Id.* at 45.)

More specifically, Section 15.0 of the Otis Safety Manual contains a specific section with respect to safety harnesses on construction projects.  That section provides, in relevant part:

**Construction:**

On construction, a safety harness or fall protection uniform and **shock absorbing lanyard shall be worn at all times.**  The lanyard must be connected at all times when there is an exposure to a fall of six feet (two metres) where guardrails are not present for protection.

\*        \*        \*

**Exceptions:**

A.    The harness or fall protection uniform does not have to be worn if an Otis associate is attending a meeting at a site construction office and no other work activities are involved.

B.    The project will no longer be considered a construction site when the contractor has obtained an occupancy permit.

C.    All elevators/escalators have been placed on final acceptance.

D.    A "handover" to Service has been completed and construction work is 100% completed on **all** elevators/escalators.

(DeRay Dep. Ex. 4 at 52-53.)  In short, Otis employees must wear a safety harness at all times on construction unless one of the four exceptions is satisfied.  These exceptions do not exempt employees who operate elevators on a construction site from wearing a harness.  DeRay saw the fall protection section of the Otis Safety Manual toward the beginning of his work at the Mohegan Sun construction project.  (DeRay Dep. at 13.)

2.    July to September 2001: DeRay Works at the Mohegan Sun Project, But Does Not Wear the Safety Harness at all Times While Working on the Site

Returning to the Mohegan Sun construction project, Otis first assigned DeRay to assist in the installation of an unmanned Galisbe lift. (DeRay Dep. at 14.)  When DeRay worked on the installation of the lift, he wore a safety harness. (*Id.* at 16.)

Otis also assigned DeRay to operate elevators on the construction site that were temporarily used to transport materials and personnel to other parts of the construction project. (DeRay Dep. at 17, 23, 48.)  When operating the elevator, however, DeRay did not wear a safety harness. (*Id.* at 17-18.)  As noted above, on construction, Otis' safety policy requires all employees to wear the harness at all times, with certain exceptions, such as when all of the elevators have been placed on final acceptance and when all construction work on elevators has been completed with the elevators being handed over to service. (DeRay Dep. Ex. 4 at 52-53.)  As noted above, the Otis Agreement defines construction broadly, to include all work associated with the installation of elevators and escalators, including the operation of temporary elevators. When DeRay operated the elevator, not all of the elevators were turned over to Mohegan Sun (DeRay Dep. at 42), meaning that not all of the elevators had been placed on final acceptance and had been handed over to service.

        3.      September to November 26, 2001: Supervisor Russ Larson Instructs DeRay to Wear the Safety Harness But DeRay Does Not Comply With the Instruction Until Asked by the IUEC Local 91 Business Manager

At some point in September 2001, DeRay's supervisor, Russ Larson, approached DeRay and instructed him to wear the safety harness while operating the elevator at the Mohegan Sun construction project. (DeRay Dep. at 20.)  Supervisor Larson required, not just DeRay, but all Otis employees who operated elevators at the Mohegan Sun construction project to wear safety harnesses. (*Id.* at 38.)  Yet, DeRay refused to comply with Larson's instruction. (*Id.* at 33, 43.)

7

Thereafter, DeRay went to a meeting of IUEC Local 91's Executive Board in October, 2001. (DeRay Dep. at 39; DeRay Dep. Ex. 5 at 2.) He raised the issue of being required to wear the safety harness at the meeting (DeRay Dep. at 39.)   DeRay claims that IUEC Local 91's Business Manager, Dominic Accarpio, agreed with him and would straighten the matter out. (DeRay Dep. Ex. 5 at 2.) DeRay continued to work at the Mohegan Sun construction project without wearing the required safety harness.

At some point thereafter, Supervisor Larson approached DeRay a second time and instructed him to wear the safety harness or walk, *i.e.*, leave the job site. (DeRay Dep. at 43.) Rather than wear the safety harness and continue to work, DeRay immediately left the construction site and went to the casino area of the Mohegan Sun complex. (*Id.* at 44.) In the casino area, DeRay called Business Manager Accarpio to explain the situation. (*Id.*) Accarpio instructed DeRay to return to work, wear the safety harness and that Accarpio would straighten matters out in a couple of days. (*Id.* at 45.) DeRay returned to the Mohegan Sun construction project and donned a fall protection uniform, which, as noted above, has a safety harness built into it. (*Id.*) According to DeRay, he wore this "in protest." (DeRay Ex. 5 at 2.) DeRay further believed that "[t]he business agent was unable to correct the [issue] and I was conforming to the policy even though I viewed the policy as unnecessary [control]." (*Id.*)

    4.    <u>November 27 to December 10, 2001: DeRay's Confrontation with Supervisor Larson and DeRay's Refusal to Wear the Safety Harness</u>

DeRay's self-perceived "protest" came to a head on November 27, 2001. On that date, DeRay went to Supervisor Larson's office where a confrontation between DeRay and Larson erupted. (DeRay Dep. at 46.)   DeRay claims Larson said he was letting DeRay work at Mohegan Sun as long as DeRay wore the safety harness; and if DeRay took off the harness, Larson would fire him. (DeRay Dep. Ex. 5 at 3.) Upset over what he perceived to be a violation

of "human dignity" and an unspecified "0" tolerance, DeRay left the office intent on not wearing

the safety harness—or the fall protection uniform—anymore. (DeRay Dep. at 46.)

DeRay worked the following days without wearing a safety harness. (DeRay Dep. at 50-

51.) On one of those days, DeRay asserts that he was operating the elevator when Supervisor

Larson, who was wearing his safety harness,[2] and a couple of other individuals entered the car.

DeRay describes the encounter as follows:

> A few hours passed and the supervisors were again transported in my elevator to
> another destination and Russ [Larson] said "Get your harness on"  I'll be
> checking on you at noon, but he didn't because I think he knew it was a battle of
> wills which he had already confronted me on November 27th for no material
> reason.  His orders are of control, not reason and he is not my God nor is money
> my commander.  I work hard for my money so you better treat me with dignity or
> respect or take the job and respectfully following the song, shove it.

(DeRay Dep. Ex. 5 at 3.)[3]  As this conflict brewed, DeRay did not seek the assistance of a

representative from IUEC Local 91 or the IUEC.

Instead, DeRay acted on his own and confronted Larson at some point on either

November 30, 2001 or December 4 or 5, 2001 in Larson's office.  (DeRay Dep. at 52.)  Once

again, in DeRay's own words:

> The following day Russ [Larson] came in and I chose to confront him in the
> office alone.  Dan Binette came in about 2 or 3 minutes later.  Dan, in my opinion
> is not a dependable source of honesty, therefore I may be damned if I do and
> damned [if] I don't, depending on the depth of the investigation.  I was angry but
> composed enough to confront Russ with the (why) my anger was due to the fact
> that the issue should have been mooted while I was faithfully conforming, but
> Russ [Larson] chose to rub salt into the wound.  I was no longer willing to
> conform to the necessary alleged requirement that served no useful purpose and
> provided a few irritable construction workers an [irresistable] urge to tug on.

---

[2] DeRay attributes Larson's wearing of a harness while riding in the elevator to Larson being "a
harness freak." (DeRay Dep. at 53.)

[3] As explained *infra*, DeRay typed this document in connection with his attempt to pursue his
own grievance on December 10, 2001.

(DeRay Dep. Ex. 5 at 3.)  In other words, DeRay told Larson that he (Larson) turned a joke into a confrontation before the crew.  DeRay added that he would not wear the safety harness until Larson showed him that Otis has a policy that requires workers to wear unnecessary equipment which is of no help to them or is not for safety.  (DeRay Dep. at 52.)   True to his word, DeRay did not don a safety harness or a fall protection uniform while working on the Mohegan Sun construction project.  While he defied Larson's instructions and Otis' safety policy, DeRay claims to have tried to invoke the grievance procedure to protest Larson's conduct and the safety harness policy.

> 5. December 10, 2001: DeRay Fails to Follow the Grievance and Arbitration Procedure in the Otis Agreement

### a.    The Grievance and Arbitration Procedure

Article XV of the Otis Agreement, entitled "Arbitration," sets forth a multi-step grievance process that does allow employees to initiate the process.  The first step of the process, the "Oral Step," is set forth in Paragraph 2 of Article XV and provides:

> Any employee, local union or the Company with a grievance (hereinafter called the "grievant"), shall discuss the grievance with the designated Company Representative (or Local Union Representative) within ten (10) working days after the cause of the grievance is known or should reasonably have been known. The Company shall designate to each local union the Company's Representative(s) for the purpose of responding to grievances at this step.  If the grievance is initiated by an employee, the Local Business Representative shall be present during the discussion.

> Within three (3) working days after the above discussion, the Company's Representative shall notify the employee and the Local Union Business Representative of his disposition of the matter.

> The Local Business Representative shall similarly respond to the Company's grievance.

(Koerbel Aff. ¶ 15; Koerbel Aff. Ex. 1 at 60.)  While an employee can initiate the process by discussing his or her grievance with the designated Company representative, it is imperative that the Local Business Representative be present during the discussion.  This requirement preserves the role of the Union in the initial stage of the grievance and arbitration process, which, in turn, provides employees with union representation at that initial stage and prevents the employer from directly dealing one-on-one with employees concerning grievances.

The next step, which is "Written Step One," is set forth in Paragraph 3 of Article XVI. That paragraph provides:

> If the issue remains unresolved after the conclusion of the Oral Step, the grievant, within ten (10) working days of the conclusion of the Oral Step, may submit in writing on provided forms a brief statement of the grievance, including the Article and paragraph of the Agreement allegedly violated (if known), and the remedy requested.

> Within fifteen (15) working days after the written grievance is received by the Company (or the Union), a meeting will be held to discuss the grievance.  The Company shall be represented by the Regional Manager, Field Employee Relations or his designee and the designated Company Representative described in Paragraph 2.  The union shall be represented by the IUEC Regional Director or other Representative Designated by the General President and the Local Business Representative described in Paragraph 2.

> At the meeting (or any continuation thereof agreed to by the parties) the company (or the Union) shall give its written answer to the grievance on the provided form. Within ten (10) working days of that disposition, the Company or the Union shall indicate on the grievance form whether it appeals therefrom.  If the grievance disposition is not appealed, it shall be final and binding on all parties.

(Koerbel Aff. ¶ 18; Koerbel Aff. Ex. 1 at 60-61.) Defendant Ronald Koerbel is an IUEC Regional Director, the individual referenced in Written Step One as a representative of the IUEC during the grievance meeting, and he handles grievances at that stage of the process. (Koerbel Aff. ¶ 2.)

After "Written Step One," the employer or the union can appeal to "Written Step Two." This second written step is set forth in Paragraph 4 of Article XV and provides:

> If the grievance is appealed it shall be placed on the agenda of a scheduled meeting of the National Arbitration Committee. The Company shall be represented by the Director, Industrial Relations or his designee and a panel of two (2) additional Company Representatives. The Union shall be represented by the General President or his designee and two (2) additional representatives.
>
> The National Arbitration Committee shall meet once per calendar quarter. Each party shall submit an agenda not less than seven (7) working days prior to the meeting.
>
> The Director, Industrial Relations or his designee (or the General President, IUEC or his designee) shall render a disposition of the grievance in writing at the National Arbitration Committee Meeting. If the grievance disposition is accepted, it shall be final and binding on all parties.

(DeRay Dep. Ex. 4 at 61-62; Koerbel Aff. ¶ 19.) If the grievance disposition is not accepted, then either the employer or the union can appeal to arbitration. (DeRay Dep. Ex. 4 at 62; Koerbel Aff. ¶ 20.)

### b.    DeRay's December 10, 2001 "Grievance"

On December 10, 2001, DeRay went to the office of IUEC Local 91 and asked the Local's secretary to type a document for him. (DeRay Dep. at 28, 31.) The document is addressed to "the designated company representative who shall be discussing the grievance brought to the attention of Russ Larson due the fact that the grievance centers around Mr. Larson." (DeRay Dep. Ex. 5 at 1.) DeRay designates himself as the "grievant," citing Article XV of the Otis Agreement.

In his self-styled grievance, DeRay states, "the Oral Step, Par. 2. The Grievant, John DeRay confronted supervisor, Russ Larson, with the grievance on December 4th or 5th of the year 2001." (DeRay Dep. Ex. 5 at 1. *See also* Section II.B.4 (discussing DeRay's "confrontation" with Larson on December 4 or 5, 2001.) While DeRay read the grievance procedure prior to

drafting the December 10 document (DeRay Dep. at 57), he admitted that he did not contact a

business representative of IUEC Local 91, or a representative of the IUEC, prior to the

December 4 or 5 "confrontation." (*Id.* at 58.) During his deposition, DeRay testified:

Q:    (by counsel for IUEC and Koerbel) Returning to the December 4th and 5th meeting, the reason why there was no union representative there was because you didn't tell them about it. Correct? You didn't tell them about the meeting?

A:    (by DeRay) This was – this was not a scheduled meeting. This was an opportunity ***when Russ was alone and I had an opportunity to go in and confront him about what he had done*** and how wrong it was and if he would have apologized to me, in front of the crew, as he brought it up in front of the crew, I would have continued to wear the harness.

Q:    But after that incident, you considered that meeting to be the oral step. Correct?

A:    Not necessarily – no. Actually, no.

Q:    In Exhibit 5 [the December 10 document]?

A:    ***If you have an argument with someone, do you consider that—are you going to say, I can't argue with you right now? I am really mad. I have to call my business agent and wait for him to come over in order for me to get this off my chest? No. That's now how arguments – that's not how arguments work.***

Q:    In Exhibit 5, on the front page, it says, "To date, the oral step, paragraph 2, the grievant, John DeRay confronted supervisor Russ Larson with the grievance on December 4th or 5th of the year 2001."

A:    Yep.

Q:    I presume you meant that to be your oral step?

A:    I would say it was, you know—as far as I was concerned, it would be an oral step that would initiate a written step, yes.

(*Id.* at 60-61 (emphasis added).)

In seeking to initiate a written step, DeRay asked Jeff Hastings, a supervisory official for

Otis, for the particular forms required by the Otis Agreement. (DeRay Dep. at 80-81) Hastings

told DeRay that he did not know of any particular form. (*Id.* at 81.) Hastings told DeRay to simply write a letter. (*Id.*) Thus, DeRay had the union secretary compose the December 10, 2001 document. (DeRay Dep. Ex. 5.)   DeRay then claims that he left a copy of the December 10, 2001 document on the desks of Jeff Hastings and Dominic Accarpio. (DeRay Dep. at 62-63.) DeRay admits that he did not contact Ronald Koerbel, who is the IUEC Regional Director, after DeRay was terminated in February 2002. (*Id.* at 66.)

      6.    December 11, 2001 to February 5, 2002: DeRay Continues to Refuse to Wear a Safety Harness Despite Otis Directives

On January 28, 2002, Supervisor Larson sent an internal correspondence to "all construction personnel," which DeRay received. (DeRay Dep. at 69; DeRay Dep. Ex. 6.)   The internal correspondence was "a reminder of the Otis safety harness policy for construction employees." (DeRay Dep. Ex. 6.) The correspondence set forth the excerpt from the Otis safety policy instructing that "[o]n construction, a safety harness or fall protection uniform and shock absorbing lanyard shall be worn at all times." (*Id.*)   The correspondence set forth the four exceptions, which, as noted above, do not include the operation of an elevator on a construction site. (*Id.*)   Thereafter, any employee who previously did not wear the safety harness began to wear the harness. (DeRay Dep. at 101.)  Any employee, except John B. DeRay.

DeRay continued to refuse to wear the harness after the January 28, 2002 internal correspondence.   (DeRay Dep. at 69.)   A few days after the internal correspondence was distributed, IUEC Local 91 Business Manager Accarpio visited the Mohegan Sun construction project. (*Id.* at 70-71.)  At the project, Accarpio advised DeRay that he should wear the safety harness because it is Otis' policy or he could be fired. (*Id.*)  DeRay continued to refuse to wear the harness despite the directions of his supervisor and the advice of his Business Manager. (*Id.*)

7.     <u>February 6, 2002: Otis Terminates DeRay for Refusing to Comply with the Safety Policy Regarding the Wearing of Safety Harnesses</u>

On February 6, 2002, which was approximately seventy days after DeRay wore the safety harness for the last time, Otis terminated DeRay. (DeRay Dep. at 71.) Otis (through supervisor Larson) provided DeRay with a letter that read, "[b]ecause you continue to violate the safety policy regarding harnesses on construction sites, I have no alternative other than to terminate your employment with Otis Elevator Company effective immediately." (DeRay Dep. Ex. 7.)

8.     <u>February 12, 2002: DeRay Fails to Comply with the Grievance Procedure for a Second Time</u>

Six days letter, on February 12, 2002, DeRay returned to the office of IUEC Local 91 and asked the union's secretary to type another document. (DeRay Dep. at 73; DeRay Dep. Ex. 8.) This document, dated February 12, 2002, was addressed to the National Arbitration Committee and cited Article XXII, Paragraph 4(e) of the Otis Agreement.   That subparagraph provides:

> It is understood and agreed that prior to terminating an employee for unsatisfactory performance who is to be replaced under this paragraph or any other employee, the Company will give a written warning to the employee with a copy to the Business Representative in order that the employee be given an opportunity to improve his work performance.   Such a termination may be submitted as a grievance to the National Arbitration Committee as provided under Article XV as a final source of appeal.

(Koerbel Aff. Ex. 1 at 87.)    DeRay claims he left a couple of copies of his February 12 document with Otis and left a copy on the desk of IUEC Local 91 Business Manager Accarpio. (DeRay Dep. at 74. ) DeRay claims that he faxed documents, including the February 12, 2002 document, to Defendant Koerbel on one occasion, but he does not recall the date. (*Id.* at 75-76.) Defendant Koerbel did not receive any documents from DeRay prior to March 14, 2001. (Koerbel Aff. ¶ 22.)

15

**C.**    **Events After DeRay's Termination from Otis**

    1.    <u>February 22, 2002: DeRay Drafts a Letter Threatening to Sue</u>

On February 22, 2002, DeRay had a letter drafted "to whom it may concern." (DeRay

Dep. at 81-82; DeRay Dep. Ex. 9.) In that letter, DeRay wrote:

> Notice of intent to file lawsuit to be filed in the following manner. Employee
> John DeRay believes he was terminated in violation of an Agreement between
> Otis Elevator Company and the Union (Local 91) for the Following Reasons
> contained in the Otis Elevator/Union Agreement, Page 59, Article XV,
> Arbitration.
>
> The notice is not one for requirement but one of courtesy to inform you of my
> reasoning. I hope you will consider that which I consider logical.
>
> This case due to termination may hinge on common sense. If a jury of my peers
> agrees with you and your harness policy (over extended) as to what is written, I
> lose, but if that jury will put themselves in the shoes of common sense, I [submit],
> you will lose.
>
> I am available for 1st or 2nd shift work.

(DeRay Dep. Ex. 9.) At his deposition, DeRay testified that this letter referred to the same

grounds as to the present lawsuit, except with respect to Earnest Lowe. (DeRay Dep. at 82-83.)

    2.    <u>March 14, 2003: The Meeting with Otis</u>

On March 14, 2003, Defendant Ronald Koerbel, who is a Regional Director of the IUEC,

was scheduled to meet with Earnest Lowe, a labor relations representative of Otis, and Dominic

Accarpio, the Business Manager of IUEC Local 91, about other matters. (Koerbel Aff. ¶ 21.) As

the Regional Director, Koerbel is the individual who attends the meetings with management

required at the Written Step One phase of the grievance procedure. (Koerbel Aff. ¶¶ 2, 21-22.)

The March 14 meeting was to discuss grievances that had progressed to Written Step One.

Neither DeRay's December 10, 2001 nor his February 12, 2002 had been filed in accordance

with the grievance procedure, and Koerbel did not see either document prior to March 14, 2002. (Koerbel Aff. ¶ 22.)

Nevertheless, Lowe mentioned that he received a letter from DeRay protesting his termination for not wearing a safety harness. (Koerbel Aff. ¶ 22) Lowe showed Koerbel a copy of the letter. (*Id.*) Lowe, Koerbel and Accarpio discussed the circumstances underlying DeRay's termination. (Koerbel Aff. ¶ 23.) Accarpio stated that DeRay had received several warnings from Otis regarding his failure to wear the harness. (*Id.*) Accarpio stated further that he went to the job site and instructed all elevator operators to wear the safety harness but DeRay stated he was not going to wear safety harness no matter what Accarpio or Otis said. (*Id.*) Given DeRay's refusal to comply with Otis' safety policies, Defendant Koerbel agreed with Otis, *i.e.*, Lowe, and Accarpio that the dismissal was just. (*Id.*)

3.    May 23, 2002: The Meeting at IUEC Local 91's Offices

On May 23, 2003, Defendant Ronald Koerbel went to the offices of IUEC Local 91. (Koerbel Aff. ¶ 26.) While at the offices, DeRay and another member entered and met with Koerbel and Accarpio. (*Id.*) During this meeting. Accarpio told DeRay that he did not file a grievance with the Union. (*Id.*) DeRay responded that he sent a letter to Otis to complain about his termination and that he had a meeting with Otis on the matter. (*Id.*) Koerbel told DeRay that the grievance had no merit because DeRay was told by Otis and Accarpio to comply with the safety policy and DeRay refused to comply. (Koerbel Aff. ¶ 27.) Koerbel added that it is Otis' safety policy that the job site is a construction site until all elevators are turned over. (*Id.*) While DeRay disputed whether Otis claimed the Mohegan Sun job was a construction site, he admitted that he did not wear the harness and he would not comply. (*Id.*) DeRay added that he would not comply because of his dispute with supervisor Lawson and because he saw the matter as one of

principle. (*Id.*) Defendant Koerbel then suggested that DeRay contact Otis' Human Resources to see if they could help because it seemed as if DeRay had a personal problem with Larson. (*Id.*)

4.    December 4, 2002: DeRay Files the Complaint in this Case

Approximately seven months later, on December 4, 2002, DeRay filed the complaint in this case. (DeRay Dep. at 9.)  In the caption, he named Russ Larson, Jeff Hastings, Earnest Lowe and Otis Elevator.   He also named Ronald Koerbel and Dominic Accarpio and "International Union of Elevator Constructors."  The IUEC, Koerbel, IUEC Local 91, Accarpio and Otis filed answers to the complaint.  The Court dismissed Larson, Hastings and Lowe in its September 16, 2003 ruling.

### III.    SUMMARY JUDGMENT STANDARD

It is well-established that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  *See also Matsushita Elec. Indus. Co., LTD v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  As the movants, the IUEC and Koerbel have the burden of establishing that there are no genuine issues of material fact and that they are entitled to judgment as a matter of law.  *Murphy v. Air Transport Local 501*, 123 F. Supp.2d 55, 58 (D. Conn. 2000).  In considering the record, the Court will evaluate the evidence in the light most favorable to the non-movant, *i.e.*, DeRay, as well as draw all inferences and resolve all ambiguities in his favor.  *Id.*

"[P]roceeding pro se does not otherwise relieve plaintiff from the usual requirements of summary judgment." *Lin v. New York City Admin. for Children's Svcs.*, No. 99-Civ. 10314 (LAP), 2003 U.S. Dist. LEXIS 14264, at *17 (S.D.N.Y. Aug, 21, 2003).  Thus, to avoid

summary judgment, DeRay must establish that there is a genuine issue of material fact precluding summary judgment in favor of the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). DeRay can satisfy this burden by establishing "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). These specific facts must be material, *i.e.*, they must "affect the outcome of the suit under the governing law. . . ." *Anderson*, 477 U.S. at 248. Also, the disputes over those facts must be genuine, *i.e.*, there must be sufficient evidence to support the fact so "that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV.    ARGUMENT

This Court has recognized that the allegations in Plaintiff DeRay's complaint present what is commonly referred to as a "hybrid" action under Section 301 of the Labor Management Relations Act. *DeRay v. Larson*, No. 03:02-CV-2139 (JCH), slip op. at 6 (D. Conn. Sept. 16, 2003).[4] In a "hybrid" action, a plaintiff makes two sets of interrelated allegations, upon which he or she bears the burden of proof: "(1) that the employer breached a collective bargaining agreement and (2) that the union breached its duty of fair representation." *Id.* (quoting *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001)). Plaintiff DeRay alleges that (1) Supervisor Russ Larson breached the Otis Agreement by terminating DeRay and (2) IUEC Local 91 Business Manager Dominic Accarpio and IUEC Regional Director Ronald Koerbel failed or

---

[4] As the Court noted in its September 16, 2003 ruling, Plaintiff DeRay invoked the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983. Neither the Constitution nor Section 1983 reaches labor organizations or their conduct because unions and their representatives are not state actors, do not engage in state action and do not "act under the color of state law." *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002). Plaintiff DeRay also alleged a violation of Connecticut State law; however, to the extent he is relying upon state law in support of his claim that any Union Defendant failed or refused to represent him, DeRay's claims are preempted by Section 301 and the duty of fair representation. *Bergeron v. Henderson*, 52 F. Supp. 2d 149, 153-54 (D. Me. 1999).

refused to represent DeRay with respect to his "grievances," *i.e.*, breached their duty to represent DeRay. Procedurally, however, DeRay must first establish that the violation of the duty of fair representation occurred, because, if there is no violation of the duty, the employee has no redress against the employer. *Vaca v. Sipes*, 386 U.S. 171, 186-187 (1967); *Flanigan v. Truck Drivers Local No. 671*, 942 F.2d 824, 828 (2d Cir. 1991).

**A.  Defendant Koerbel is Entitled to Summary Judgment as an Action Against Koerbel Cannot be Maintained Under Section 301**

In his complaint, Plaintiff DeRay alleges that Defendants Dominic Accarpio and Ronald Koerbel failed or refused to represent DeRay. Plaintiff DeRay further seeks a substantial amount of monetary damages from both Accarpio and Koerbel, *viz.*, "[f]rom Dominic and Ron Koerbel, in their official capacity as representatives of [IUEC] and Local 91, the equivalent of one [year's] severance pay with pension benefits plus punitive damages...." (Compl. at 5.)[5]  During his deposition, DeRay reiterated that the only relief he seeks in this action is monetary in nature. (DeRay Dep. at 103.)

Under Section 301, however, it is well-established that union officers are immune from lawsuits by individual union members for alleged breaches of the duty of fair representation. *Morris v. Local 819, Int'l Bhd. of Teamsters*, 169 F.3d 782, 784 (2d Cir. 1999); *DeRay v. Larson*, No. 3:02-CV-2139 (JCH), slip op. at 7-9; *Covello v. Depository Trust Co.*, 88 F. Supp.2d 59, 61-62 (E.D.N.Y. 2000); *Daniels v. Anheuser-Busch, Inc.*, No. 96-CV-1518, 1997 U.S. Dist. LEXIS 13060, at *8 (N.D.N.Y. Aug. 27, 1997). This shield of immunity is provided by Section 301(b),

---

[5] It is well-established that a plaintiff cannot recover punitive damages in a Section 301 action involving a breach of the duty of fair representation claim. *See International Bhd. of Elec. Workers v. Foust*, 442 U.S. 42, 48-52 (1979); *Erhard v. Local Union No. 604*, 914 F. Supp. 954, 956 (W.D.N.Y. 1996); *Ghartney v. Saint John's Queens Hosp.*, 727 F. Supp. 795, 797-98 (E.D.N.Y. 1989). Accordingly, the Court should grant summary judgment to the Union Defendants with respect to DeRay's claim for punitive damages.

29 U.S.C. § 185(b). That section expressly excludes union officers and employees from liability for money judgments arising from their responsibilities on behalf of the union. 29 U.S.C. § 185(b). *See also Morris*, 169 F.3d at 734; *Covello*, 88 F. Supp.2d at 61-62; *Daniels*, 1997 U.S. Dist. LEXIS 13060, at *8. If a litigant seeks monetary damages, the only recourse is to sue the union. *Covello*, 88 F. Supp.2d at 62.

Given DeRay seeks monetary damages, the applicable rule is that"[u]nion officers and employees are not individually liable for acts performed as representatives of the union." *Covello*, 88 F. Supp.2d at 59. The Court has already recognized these principles with respect to Otis' supervisors—Russ Larson, Jeff Hastings and Earnest Lowe—in its September 16, 2003 ruling. *DeRay*, No 3:02-CV-2139 (JCH), slip op. at 9. Thus, DeRay cannot maintain this lawsuit against Defendant Koerbel. DeRay's only recourse is an action against the unions, IUEC and/or IUEC Local 91. *Morris*, 169 F.3d at 784. For these reasons, Defendant Koerbel is entitled to summary judgement and to being dismissed from this case entirely.

**B.    Defendant IUEC is Entitled to Summary Judgment Because Plaintiff DeRay Cannot Establish that the IUEC Acted Arbitrarily, Discriminatorily or in Bad Faith With Respect to DeRay's Alleged "Grievances"**

1.    The Standard Governing the Duty of Fair Representation

Assuming that DeRay's allegations pertaining to Defendants Accarpio's and Koerbel's failure or refusal to represent really mean Defendant IUEC Local 91's and IUEC's failure or refusal to represent, the analysis turns to the nature of the duty of fair representation. This duty arises from the labor organization's role as the exclusive bargaining representative of employees under the National Labor Relations Act. *Marquez v. Screen Actors Guild*, 525 U.S. 33, 44 (1998). The duty entrusts a labor organization with the obligation "to represent all members of the designated unit" and, more specifically, "to serve the interests of all members without

hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca*, 386 U.S. at 177.

To establish a breach of the duty of fair representation, Plaintiff DeRay must establish that IUEC Local 91 or the IUEC acted in an arbitrary, discriminatory or bad faith manner. *Vaca*, 386 U.S. at 190 (stating "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory or in bad faith").[6] Mere negligence on the union's part will not establish a breach of the duty of fair representation. *United Steelworkers of Am. v. Rawson*, 495 U.S. 362, 374 (1990). "The Second Circuit has noted that unintentional conduct not calculated to harm union members may violate a union's duty of fair representation, but only if that conduct is 'so egregious, so far short of minimum standards of fairness to the employee and so unrelated to legitimate union interests as to be arbitrary.'" *Murphy*, 123 F. Supp. 2d at 58 (quoting *Cruz v. Local Union No. 3 of the Int'l Bhd. of Elec. Workers*, 34 F.3d 1148, 1153 (2d Cir. 1994)). Tactical errors and errors of judgment also do not give rise to a breach of the duty of fair representation. *Id.* However, the arbitrary disregard of a ***meritorious*** grievance or the perfunctory processing of it would constitute a breach of the duty of fair representation. *Id.*

Plaintiff DeRay does not specifically allege that IUEC Local 91 or the IUEC acted arbitrarily, discriminatorily or in bad faith; instead, he simply alleges that the Unions did not

---

[6] If the plaintiff can establish that a union's conduct was arbitrary, discriminatory or in bad faith, the plaintiff must then establish that the union's conduct "seriously undermined the arbitral process." *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 567 (1976). This second element includes a requirement that the plaintiff establish a causal nexus between the union's alleged wrongful conduct an the injury. *White v. White Rose Food*, 237 F.3d 174, 179 (2d Cir. 2001); *Vargas v. Hill*, 152 F. Supp.2d 315, 320, n.6 (S.D.N.Y. 2001). Given that DeRay cannot establish the first element, *i.e.*, arbitrary, discriminatory or bad faith conduct, the Court need not reach the second element.

represent him with respect to his alleged "grievances." In this regard, the Supreme Court has recognized that, "[i]n administering the grievance and arbitration machinery as statutory agent of the employees, a union must, in good faith and in a non-arbitrary manner, make decisions as to the merits of particular grievances." *Id.* at 194. Thus, courts have recognized that a union has the discretion to refrain from processing a non-meritorious grievance or settling a grievance short of arbitration. *See Rennie v. Glass, Molders, Pottery Plastics & Allied Workers Int'l Union*, 38 F. Supp.2d 209, 215 (D. Conn. 1999). *See also Serow v. Redco Foods, Inc.*, 187 F. Supp.2d 47, (N.D.N.Y. 2002); *Vargas v. Hill*, 152 F. Supp.2d 315, 320 (S.D.N.Y. 2001). If the union does so in a non-arbitrary and/or non-discriminatory manner, or lacks bad faith, then the union does not breach its duty of fair representation. In short, an employee does not have "an absolute right" to have his grievance taken to arbitration. *Vaca*, 386 U.S. at 191.

The duty of fair representation standard, as set forth above, "demonstrates that the plaintiff's burden is a demanding one, as 'judicial review of union action … must be highly deferential, recognizing the wide latitude that unions need for the effective performance of their bargaining responsibility.'" *Murphy*, 123 F. Supp. at 59 (quoting *Spellacy v. Air Line Pilots Ass'n*, 156 F.3d 120, 126 (2d Cir. 1998). In light of the interest in an effective bargaining representative, "the claims of the individual employee must sometimes bow to the interests of the union membership as a whole." *Id.*

As explained in the next subsections, the IUEC is entitled to judgment as a matter of law for two reasons. First, Plaintiff DeRay's allegations are barred by the six-month statute of limitations that governs duty of fair representation claims and hybrid actions under Section 301. Second, even assuming the allegations are not barred by the statute of limitations, there are no genuine issues of material fact that would need to be tried before a jury; the undisputed facts

establish that the IUEC did **not** act arbitrarily, discriminatorily or in bad faith when it decided not to pursue Plaintiff DeRay's claims.

2.   Plaintiff DeRay's Allegations Against the IUEC are Barred by the Six Months Statute of Limitations Governing Section 301 Actions

Duty of fair representation claims, as well as hybrid actions, are governed by the six month statute of limitations set forth in 29 U.S.C. § 160(b). *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 155 (1983).   When a breach of the duty of fair representation accrues for purposes of the statute of limitations is well-settled. "[A] breach of the duty by the union is apparent to the member at the time [he or] she learns of the union action or inaction of which he complains." *Ghartey v. St. John's Queens Hosp.*, 869 F.2d 160, 165 (2d Cir. 1989).  When the employee has actual notice or constructive notice of the complained action or inaction, the clock begins to run.   That clock continues to run even if the employee "entertained hopes of future representation by the Union," because the employee is on notice of the alleged lack of representation in the present. *Cohen v. Flushing Hosp. & Med. Ctr.*, 68 F.3d 64, 68 (2d Cir. 1995).

In this case, Plaintiff DeRay never invoked the grievance procedure with respect to either his issue concerning the safety harness policy or his termination.  The undisputed evidence establishes that DeRay acted on his own, after a dispute with Supervisor Russ Larson, by precipitating another confrontation with Larson on November 30 or December 4 or 5, 2001. (DeRay Dep. at 60-61.) DeRay did not seek the assistance of IUEC Local 91 or the IUEC at that time because "that's not how arguments work." (DeRay Dep. at 61.) After that "argument," DeRay continued to act on his own by causing a self-styled grievance invoking Written Step One on December 10, 2001. DeRay drafted this document without the assistance of a representative from IUEC Local 91 or the IUEC. DeRay's self-styled grievance was not in the proper form and,

in any event, completely overlooked the Oral Step.  Having completely excluded IUEC Local 91 and IUEC from any representation and acting on his own, DeRay now expected the Unions to continue his "argument" with Otis Elevator by pursuing his December 10, 2001 document. DeRay provided the document only to IUEC Local 91 by leaving it on the Business Manager's desk.  DeRay did not provide the document to the IUEC until some point after his termination in February 2002.  (DeRay Dep. at 66.)

Clearly, at some point prior to June 4, 2002, Plaintiff DeRay had to have knowledge that the Union was not proceeding on his "self-styled" and improperly filed "grievance."  This knowledge could be inferred when DeRay received the Internal Correspondence from Otis on January 28, 2002 reaffirming the safety policy, or the IUEC Local 91 Business Manager's advice to wear the safety harness on February 5, 2002, or when DeRay was terminated for failing to comply with the safety harness policy on February 6, 2002.  Given that knowledge, all of which arose more than six months prior to the filing of the complaint in this case, DeRay's claim with respect to his December 10, 2001 document is time-barred.  *Cohen*, 68 F.3d at 84.

Not only is DeRay's claim with respect to the December 10, 2001 document time-barred, but so is his claim with respect to his February 12, 2002 document.  Once again, without the assistance of an officer of IUEC Local 91 or the IUEC, DeRay caused a document dated February 12, 2002 to be typed to the "National Arbitration Committee" concerning his termination from Otis.  DeRay left that document on the desk of the IUEC Local 91 Business Manager.  However, the IUEC Local 91 Business Manager is not a member of the National Arbitration Committee, as defined in the Otis Agreement.  (*See* Koerbel Aff., Ex. 1 at 62.)   The IUEC did not receive any notice of the letter until March 14, 2002, when Otis informed Regional Director Koerbel of the letter during a meeting.  After discussing the merits of DeRay's

dismissal, Koerbel agreed with those in attendance, Otis Labor Relations Representative Earnest Lowe and IUEC Local 91 Business Manager Dominic Accarpio, that DeRay's dismissal was justified. Koerbel communicated that determination to DeRay at a May 23, 2002 meeting at the offices of IUEC Local 91. These dates—March 14 and May 23, 2002—are clearly beyond the six months preceding the filing of the complaint on December 4, 2002.

If that evidence was not sufficient, then DeRay's own words suffice to establish that his claims with respect to the February 12, 2002 letter are time-barred. On February 22, 2002, DeRay caused a "to whom it may concern" letter to be drafted in which he specifically indicates his intent to file a lawsuit because he believes that he was terminated in violation of the Otis Agreement. (DeRay Dep. at 81-82; DeRay Dep. Ex. 9.) When asked who he intended to sue, DeRay responded, "Dominic Accarpio, Jeff Hastings, Russ Larson, … and Ron Koerbel." (DeRay Dep. at 82.) DeRay also indicated that he was going to sue Otis, IUEC Local 91 and the IUEC. (*Id.* at 82-83.) DeRay indicated in the letter that the basis of the lawsuit concerned his termination in violation of the Otis Agreement, (DeRay Dep. Ex. 9), which is one of the two interrelated allegations of a hybrid action under Section 301.

Clearly, such a letter is indicative of DeRay's belief at that time of an alleged failure or refusal to represent him on the part of IUEC Local 91 or the IUEC. *See Cohen*, 68 F.3d at 84 (finding letter penned by plaintiff stating he was terminated "without the union so much as lifting a single finger in my defense up to and including this day" sufficient to establish notice of union's failure to take action). "Summary judgment is appropriate when it is clear from the uncontroverted facts that plaintiff knew, or should have known, about the breach of the duty of fair representation more than six months before filing the complaint." *Joseph v. Local UAW 1097 Union*, 917 F. Supp. 188, 192 (W.D.N.Y. 1996). In his letter, DeRay was complaining

26

about the Unions' alleged lack of action and, hence, the six month statute of limitations began to run on February 22, 2002, the date of the letter, and expired long before DeRay filed the complaint with this Court on December 4, 2002.    Accordingly, DeRay's duty of fair representation claims are time-barred.

3.    Defendant IUEC Did *Not* Act Arbitrarily, Discriminatorily or in Bad Faith With Respect to Plaintiff DeRay's Two "Grievances"

Even assuming Plaintiff DeRay's claims are not barred by the statute of limitations, the IUEC is still entitled to judgment as a matter of law because there are no genuine issues of material fact as to whether it acted arbitrarily, discriminatorily or in bad faith. In viewing whether Plaintiff DeRay meets his burden, the court should not determine whether the grievance has merit; instead, the court should "determine whether there are any issues of fact concerning whether the defendants' decisions are arbitrary, discriminatory or taken in bad faith." *Joseph*, 917 F. Supp. at 194. Plaintiff DeRay does not specifically allege how the IUEC or IUEC Local 91 failed or refused to represent him, *i.e.*, whether the failure or refusal was due to arbitrary, discriminatory or bad faith conduct. As explained below, the undisputed facts establish that the IUEC did not act arbitrarily, discriminatorily or in bad faith.

a.    **The IUEC Did Not Act Arbitrarily With Regard to DeRay's Two Alleged "Grievances"**

To establish that a union has acted arbitrarily, the undisputed facts must establish that, "in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a wide range of reasonableness as to be irrational." *Air Line Pilots Ass'n v. O'Neill*, 499 U.S. 65, 78 (1991). "This 'wide range of reasonableness' gives the union room to make discretionary decisions and choices, even if those judgments are ultimately wrong." *Marquez v. Screen Actors Guild*, 525 U.S. at 45-46 (quoting *Air Line Pilots Ass'n, supra*).

27

The undisputed facts of this case paint the following scene: John B. DeRay intentionally refused to comply with an Otis Safety Policy requiring all employees on construction to wear a safety harness because he did not believe the harness was necessary. DeRay disregarded his supervisor's directive to wear the harness and, when confronted with an ultimatum of wear the harness or walk, DeRay walked. He left the job site and called the IUEC Local 91 Business Manager, who told DeRay to return to work and wear the safety harness. DeRay reluctantly complied, claiming he wore the harness "in protest." Then, after a confrontation with his supervisor, DeRay unilaterally stopped complying with the Otis Safety Policy once again. He thereafter refused to comply with his supervisor's repeated directives, even after the Business Manager advised DeRay that his continued defiance may result in his termination. Seeing a "battle of wills" between him and his supervisor, DeRay simply refused to wear the harness at all. While DeRay claims to have filed a grievance over the policy, he did so without informing the IUEC Local 91. He also failed to file the grievance in accordance with the Otis Agreement. In any event, DeRay continued to disregard the policy by not wearing the safety harness. Otis eventually terminated DeRay for his refusal to comply with the policy and wear the harness. DeRay again claims he filed a grievance, but he did so without informing IUEC Local 91 and without complying with the Otis Agreement. The IUEC and IUEC Local 91 were presented with DeRay's alleged dated February 12, 2002 grievance by an Otis representative at a March 14, 2002 meeting.

In light of these facts, IUEC Local 91 and the IUEC determined that DeRay's "grievance" over his termination had no merit given his intentional, repeated refusal to comply with the Otis Safety Policy and given the fact that he failed to comply with the grievance procedure. *See Crider v. Spectrulite Consortium*, 130 F.3d 1238 (7th Cir. 1997). In that case, the

employee, Crider, took an extended leave of absence for a hernia operation and, after returning to work, his employer instructed him to undergo a return-to-work physical, which included a drug test. The drug test was required pursuant to the employer's "Comprehensive Alcohol/Drug Program," which was appended to the CBA. The program provided that any employee who was falsely tested would be reimbursed $250.00, but contained an exception for employees who were absent from the plant for thirty days or more. Crider asked if he would receive the $250 and the employer replied in the negative. Crider refused to take the test. When Crider went to the union, the union's representatives told Crider to take the test and, if he was not paid the $250, the union would file a grievance. Crider still refused. The employer then terminated Crider for failing to take the test and insubordination.

Addressing whether the employer breached the "just cause" provision of the collective bargaining agreement by terminating Crider, the Seventh Circuit stated:

> Crider argues not every act of insubordination will justify terminating an employee. We may agree, but that is no help to Crider. No one expects an employee to comply with an order to remove the safety device on a dangerous piece of equipment on which he is working. And it would be a different case if [the supervisor] had ordered Crider to go to her home and mow her lawn. But that is not what happened here. Crider was given a reasonable instruction and he refused to comply with it. Rather than follow the time-honored principle of industrial relations that—with few exceptions—an employee must 'obey now and grieve later,' Crider chose to exercise 'self-help' and simply refused to obey [the supervisor's] order. That was his prerogative, but not his right under the CBA.

130 F.3d at 1242. The Seventh Circuit determined, with respect to the union's duty of fair representation, that the union's decision was not irrational but reasonable, given Crider's violation of the "obey now and grieve later" principle. In the court's view, Crider caused a substantial disruption to the workplace, with employees watching as Crider willfully defied his supervisor's directives. *Id* at 1242. Such a situation undermined the supervisor's authority and posed potential harm to employee morale and discipline. *Id*

29

The facts of this case closely resemble those in *Crider*. DeRay was given the reasonable instruction to wear a safety harness, an instruction that was given to all employees who operated elevators on the construction site and was in accordance with the Otis safety policy. Rather than follow what the Seventh Circuit called the "time honored principle" of "obey now and grieve later," DeRay exercised his own form of "self-help" by refusing to wear the safety harness and comply with the policy. As the Seventh Circuit noted, "Crider acted as a law unto himself, deciding which orders to obey and which to refuse. And he aggressively challenged his supervisor's authority because he found some sort of pleasure in the conflict." *Id.* at 1243. While DeRay may not have found pleasure in challenging his supervisor, DeRay nonetheless acted like Crider, deciding for himself whether to obey the directive to wear the harness or not. Having determined that DeRay was unjustified in his steadfast refusal to comply with Otis' Safety Policy, his supervisor's instructions and his Business Manager's requests, the Unions acted well within the wide range of reasonableness accorded to them. The union itself has an interest in the safety of its members and in promoting the use of fall protection on construction sites. And, even if the union might not have agreed with every aspect of the Otis policy, or even if it felt some sympathy for DeRay, it was reasonable for the union to conclude that DeRay's willful, continued violation of his employer's policy went much too far, and the grievance was unlikely to succeed in arbitration. "Where a union makes a rational, informed, good faith decision not to proceed further with a grievance, the court will not intercede on the employee's behalf." *DeCrosta v. National Post Office Mail Handlers*, No. 90-CV-1269, 1994 U.S. Dist. LEXIS 6017, at *16-*17 (N.D.N.Y. May 4, 1994) (finding union did not act arbitrarily by failing to process grievance past Step 2 where decision based upon union representative's observation that employee, who claimed to be disabled, could perform light duty work, and determination

30

that charges against employee were serious enough to warrant removal).[7]  That the Unions chose not to continue DeRay's "battle of wills" (DeRay Dep. Ex. 5 at 2) does not rise to arbitrary conduct in violation of the duty of fair representation.

> **b.    There is No Evidence to Support any Conclusion that the Union Acted Discriminatorily or in Bad Faith**

As noted above, the other two elements of the duty of fair representation standard are that the union acts discriminatorily or in bad faith. A union acts discriminatorily if it engages in intentional and severe conduct based upon "invidious distinctions," such as race or gender, or "exhibits hostility" based upon, *inter alia*, "political differences … or personal animosities." *Baker v. Interstate Brands Corp. d/b/a Dolly Madison Cake Co.*, 801 F. Supp. 856, 864 (D. Kan. 1992).   A union acts in bad faith if it acts deceitfully, dishonestly or fraudulently. *Vargas v. Hill*, 152 F.Supp.2d 315, 319 (S.D.N.Y. 2001).

DeRay does not allege any discrimination or bad faith on the part of the IUEC or IUEC Local 91 in his complaint, and the record does not contain any such evidence.  DeRay does not claim that IUEC Local 91 or the IUEC acted pursuant to any invidious considerations or deceitfully or fraudulently.  The record is completely devoid of any such evidence.  Without that evidence, there is no genuine issue of material fact as to whether the Unions acted discriminatorily or in bad faith.  The undisputed facts establish that the Unions acted reasonably

---

[7] *See also Joseph*, 917 F. Supp. at 194 (finding union did not act arbitrarily by withdrawing grievance of employee who did not show up to work and failed to provide reason, even assuming employee was "on a binge" constitutes valid excuse, proof shows union considered employee's evidence and supports union's decision not to proceed); *Renfro v. Interstate Brands Corp. d/b/a Dolly Madison Cake Co.*, 879 F. Supp. 1582, 1584-85 (D. Kan. 1995) (finding employee had undisputed record of absenteeism and, despite employee's claim she did not know of change in absenteeism policy, union's failure to bring grievance was not arbitrary).

and did not breach their duty of fair representation to DeRay. Accordingly, the Unions are entitled to judgement as a matter of law.

## V.    CONCLUSION

Accordingly, for the foregoing reasons, Defendants International Union of Elevator Constructors, AFL-CIO and Ronald Koerbel respectfully request that the Court grant their Motion for Summary Judgement and dismiss the claims against them in their entirety.

Respectfully submitted,

By: _____
Robert Matisoff (Bar No. ct05002)
Keith R. Bolek (Bar No. ct24482)
**O'DONOGHUE & O'DONOGHUE**
4748 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 362-0041 – Telephone

By: _____
J. William Gagne (Bar No. ct02126)
**J. WILLIAM GAGNE & ASSOCS.**
1260 Silas Deane Highway
Wethersfield, CT 06109
(860) 522-5049 – Telephone

Attorneys for Defendants International
Union of Elevator Constructors, AFL-CIO
and Ronald Koerbel

109319_1

32