UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

FILED

2003 OCT 31  A 10: 50

US DISTRICT COURT
BRIDGEPORT CT

JOHN B. DeRAY,

    Plaintiff,

v.

RUSS LARSON, *et al.*,

    Defendants.

Civ. Act. No. 3:02-CV-2139 (JCH)

**DEFENDANTS INTERNATIONAL UNION OF ELEVATOR
CONSTRUCTORS, AFL-CIO'S AND RONALD KOERBEL'S
RULE 56(a)1 STATEMENT**

Pursuant to Local Rule 56(a)1 of the Local Rules of the United States District Court for the District of Connecticut, Defendants International Union of Elevator Constructors, AFL-CIO ("IUEC") and Ronald J. Koerbel ("Koerbel") respectfully submit this Rule 56(a)1 Statement setting forth material facts as to which there is no genuine dispute:

1.    The IUEC is a labor organization with work jurisdiction over all aspects of the installation, maintenance and repair of elevators, escalators and related machinery. The IUEC has approximately 25,000 members in local unions throughout the United States and Canada, including International Union of Elevator Constructors, Local 91 ("IUEC Local 91") in New Haven, Connecticut. (Affidavit of Ronald Koerbel ("Koerbel Aff.") ¶ 3.)

2.    On behalf of local unions and members, the IUEC negotiates a master collective bargaining agreement with employees. (Koerbel Aff. ¶ 4.)

3.    In 1997, there were two master agreements, a Standard Agreement with the National Elevator Industry and an "Otis Elevator Company Agreement with the International

Union of Elevator Constructors" ("Otis Agreement"), both of which were effective from July 9, 1997 to July 8, 2002. (Koerbel Aff. ¶ 4; Koerbel Aff. Ex. 1. *See also* DeRay Dep. 18-19; DeRay Dep. Ex. 4.)

4. Plaintiff John B. DeRay ("DeRay") is a member of Defendants International Union of Elevator Constructors, Local 91 ("IUEC Local 91") and the IUEC. (Deposition of John B. DeRay ("DeRay Dep.") at 97.)

5. In 2001, DeRay worked as an elevator mechanic for Defendant Otis Elevator Company ("Otis"). (DeRay Dep. at 9-10.)

6. In or about July 2001, Otis sent DeRay to work on a construction project at the Mohegan Sun Casino. (DeRay Dep. at 9-10.)

7. At the Mohegan Sun construction project, Otis required DeRay to complete safety training. (DeRay Dep. at 10.)

8. The safety training consisted of a computer program that covered different situations also covered by the Otis Safety Manual. Once the computer program was completed, DeRay went to the office of Otis on Pitkin Street, in Hartford, Connecticut, to view safety videotapes. (DeRay Dep. at 10-11.)

9. The Otis Safety Manual contains a section on "fall protection." (DeRay Depo. at 11). That section provides, in relevant part:

**Construction:**

On construction, a safety harness or fall protection uniform and **shock absorbing lanyard shall be worn at all times.** The lanyard must be connected at all times when there is an exposure to a fall of six feet (two metres) where guardrails are not present for protection.

\*   \*   \*

**Exceptions:**

2

A.  The harness or fall protection uniform does not have to be work in an Otis associate is attending a meeting at a site construction office and no other work activities are involved.

B.  The project will no longer be considered a construction site when the contractor has obtained an occupancy permit.

C.  All elevators/escalators have been placed on final acceptance.

D.  A "handover" to Service has been completed and construction work is 100% completed on **all** elevators/escalators.

(DeRay Dep. Exhibit 3 at 53-54 (emphasis in original); DeRay Dep. at 12-13.)

10. DeRay has seen the Otis Safety Manual, including the section on "fall protection" toward the beginning of his work at the Mohegan Sun construction project. (DeRay Depo. at 13.)

11. A harness is a set of straps that go between the legs, around the stomach, over the shoulders and across the chest. The straps are two inches wide and there is a hook on the back. When required, the lanyard would be hooked on the back. (DeRay Dep. at 20-21.)

12. A fall protection uniform is a pair of overalls with a built-in harness. (DeRay Dep. at 45.)

13. The Otis Safety Manual thus requires Otis employees to wear the harness or fall protection uniform, with a lanyard, "on construction" with limited exceptions, which are set forth in the policy, as quoted above. (DeRay Dep. Ex. 3 at 53.)

14. "Construction" work is defined by the Otis Elevator Company Agreement with International Union of Elevator Constructors ("Otis Agreement"). (DeRay Dep. at 21; DeRay Dep. Ex. 4 at 24; Koerbel Aff. ¶¶ 6-8.)

15. Article VII, Paragraph 1 of the Otis Agreement provides, in relevant part: "[c]onstruction work is hereby defined as erecting and assembling of apparatus as enumerated in

3

Article IV and Article IV(A) of this Agreement, except general repairs and modernization as defined in Article VIII Par. 2 and 5." (DeRay Dep. Ex. 4 at 24; Koerbel Aff. ¶ 7.)

16. Article IV, Paragraph 1 of the Otis Agreement provides: "[i]t is agreed by the parties to this Agreement that all work specified in Article IV shall be performed exclusively by Elevator Constructor Mechanics and Elevator Constructor Helpers in the employ of the Company." (DeRay Dep. Ex. 4 at 4; Koerbel Aff. ¶ 8.)

17. Article IV, Paragraph 2(r) sets forth, "[t]he operating of temporary cars." (DeRay Dep. Ex. 4 at 8; Koerbel Aff. ¶ 8.)

18. By virtue of Article VII, Paragraph 1 and Article IV Paragraphs 1 and 2(r), the Otis Agreement defines "construction work" to include "[t]he operating of temporary cars. (DeRay Dep. at 23; Koerbel Aff. ¶¶ 8-9.)

19. At the Mohegan Sun construction project, DeRay's first assignment was to install a Galisbe unmanned lift with co-worker Judd White. (DeRay Dep. at 14.)

20. While working on the installation of the unmanned lift, DeRay wore the safety harness and lanyard. (DeRay Dep. at 17.)

21. Also, at the Mohegan Sun construction project, DeRay was assigned to operate an elevator. (DeRay Dep. at 16.)

22. The elevator was used temporarily for construction. (DeRay Dep. at 48.)

23. While operating the elevator, DeRay transported construction workers and construction materials. (DeRay Dep. at 23.)

24. At the Mohegan Sun construction project, there were approximately forty (40) elevators, but not all of them were turned over to Mohegan Sun, including the elevator operated by DeRay. (DeRay Dep. at 42.)

25. DeRay's supervisor, Russ Larson, instructed DeRay to wear the harness while operating the elevator in or around September 2001. (DeRay Dep. at 20.)

26. Larson required all Otis employees, including all mechanics or helpers, who operated an elevator at the Mohegan Sun construction site to wear the safety harness. (DeRay Dep. at 38.)

27. DeRay did not comply with Larson's instruction to wear the harness. (DeRay Dep. at 33, 43; DeRay Dep. Exhibit 5 at 2.)

28. DeRay raised the issue of wearing the safety harness at an executive board meeting of IUEC Local 91. (DeRay Dep. at 39; DeRay Dep. Ex. 5 at 2.)

29. After the executive board meeting, DeRay continued to not wear the safety harness. (DeRay Dep. at 43.)

30. Supervisor instructed DeRay to put on the harness or leave the job site. (DeRay Dep. at 43.)

31. DeRay left the construction site to call the Business Manager of IUEC Local 91, Defendant Dominic Accarpio ("Accarpio"). (DeRay Dep. at 44.)

32. DeRay explained the situation to Accarpio, who instructed DeRay to wear the safety harness and Accarpio would try to straighten things out in a couple of days. (DeRay Dep. at 45.)

33. DeRay returned to the construction site and wore a fall protection uniform, which has a safety harness built into it. (DeRay Dep. at 45.)

34. On November 27, 2001, DeRay had a confrontation with Supervisor Larson in the latter's office. (DeRay Dep. at 45; DeRay Dep. Ex. 5 at 2.) After that confrontation, DeRay decided that he would not wear the harness anymore. (DeRay Dep. at 46.)

35. On or about November 29, 2001, DeRay was operating the elevator at the Mohegan Sun construction site, without wearing a safety harness, when Supervisor Larson got aboard the elevator. (DeRay Dep. at 51.) Larson told DeRay to put his harness on and that Larson would check on DeRay at noon. (*Id.*) While Larson did not check on DeRay at noon, DeRay did not put on the safety harness or a fall protection uniform. (*Id.*)

36. On December 4 or 5, DeRay confronted Supervisor Larson again in the latter's office. (DeRay Dep. at 52, 57.)

37. No union representative was present at the December 4 or 5 confrontation. (DeRay Dep. at 58.)

38. DeRay had a union secretary type a document, which is dated December 10, 2001, addressed to "the designated company representative who shall be discussing the grievance brought to the attention of Russ Larson due to the fact the grievance centers around Mr. Larson." (DeRay Dep. at 28; DeRay Dep. Ex. 5 at 1.)

39. Article XV of the Otis Agreement sets forth a grievance and arbitration procedure. (DeRay Dep. at 58; DeRay Dep. Ex. 4 at 59-62; Koerbel Aff. ¶ 14.)

40. Article XV, Paragraph 2 provides for the "Oral Step," which is the first step of the grievance procedure, and provides as follows:

> Any employee, local union or the Company with a grievance (hereinafter called the "grievant"), shall discuss the grievance with the designated Company Representative (or Local Union Representative) within ten (10) working days after the cause of the grievance is known or should reasonably have been known. The Company shall designate to each local union the Company's Representative(s) for the purpose of responding to grievances at this step. If the grievance is initiated by an employee, the Local Business Representative shall be present during the discussion.
>
> Within three (3) working days after the above discussion, the Company's Representative shall notify the employee and the Local Union Business Representative of his disposition of the matter.

6

> The Local Business Representative shall similarly respond to the Company's grievance.

(DeRay Dep. Ex. 4 at 60; Koerbel Aff. ¶ 15.)

41.  The next step in the grievance procedure is "Written Step One." This step, which is set forth in Article XV, Paragraph 3 provides:

> If the issue remains unresolved after the conclusion of the Oral Step, the grievant, within ten (10) working days of the conclusion of the Oral Step, may submit in writing on provided forms a brief statement of the grievance, including the Article and paragraph of the Agreement allegedly violated (if known), and the remedy requested.
>
> Within fifteen (15) working days after the written grievance is received by the Company (or the Union), a meeting will be held to discuss the grievance. The Company shall be represented by the Regional Manager, Field Employee Relations or his designee and the designated Company Representative described in Paragraph 2. The union shall be represented by the IUEC Regional Director or other Representative Designated by the General President and the Local Business Representative described in Paragraph 2.
>
> At the meeting (or any continuation thereof agreed to by the parties) the company (or the Union) shall give its written answer to the grievance on the provided form. Within ten (10) working days of that disposition, the Company or the Union shall indicate on the grievance form whether it appeals therefrom. If the grievance disposition is not appealed, it shall be final and binding on all parties.

(DeRay Dep. Ex. 4 at 60-61; Koerbel Aff. ¶ 18.)

42.  The next step of the grievance procedure is "Written Step Two." This step, which is set forth in Article XV, Paragraph 4, provides:

> If the grievance is appealed it shall be placed on the agenda of a scheduled meeting of the National Arbitration Committee. The Company shall be represented by the Director, Industrial Relations or his designee and a panel of two (2) additional Company Representatives. The Union shall be represented by the General President or his designee and two (2) additional representatives.
>
> The National Arbitration Committee shall meet once per calendar quarter. Each party shall submit an agenda not less than seven (7) working days prior to the meeting.

> The Director, Industrial Relations or his designee (or the General President, IUEC or his designee) shall render a disposition of the grievance in writing at the National Arbitration Committee Meeting. If the grievance disposition is accepted, it shall be final and binding on all parties.

(DeRay Dep. Ex. 4 at 61-62; Koerbel Aff. ¶ 19.)

43. If the grievance disposition is not accepted, Article XV, Paragraph 5 allows either the Union or the company to appeal the grievance to arbitration. (DeRay Dep. Ex. 4 at 62; Koerbel Aff. ¶ 20.)

44. DeRay read the grievance and arbitration procedure prior to drafting the December 10, 2001 document. (DeRay Dep. at 57.)

45. In DeRay's December 10, 2001 document, he refers to the "oral step" as: "the grievant, John DeRay confronted supervisor, Russ Larson with the grievance on December 4th or 5th of the Year 2001." (DeRay Dep. Ex. 5 at 1.)

46. DeRay did not inform either Defendant Local 91 or Defendant IUEC, or their representatives, of this "oral step" on December 4 or 5, 2001. (DeRay Dep. at 58.)

47. DeRay did not inform any representative of the IUEC about the December 10, 2001 document until he contacted Ronald Koerbel, a Regional Director of the IUEC, after his termination February 2002. (DeRay Dep. at 66, 75-76. *See also* Koerbel Aff. ¶ 25.)

48. In the meantime, DeRay continued to refuse to wear the safety harness while operating an elevator on the Mohegan Sun construction site. (DeRay Dep. at 68.)

49. On January 28, 2002, Otis sent an internal correspondence to all construction personnel concerning the harness policy. (DeRay Dep. at 69; DeRay Dep. Ex. 6.) The correspondence reiterated the safety policy regarding harness. (DeRay Dep. Ex. 6.)

50. DeRay received a copy of the January 28, 2002 internal correspondence. (DeRay Dep. at 69.)

51.  DeRay continued to refuse to wear the safety harness while operating an elevator on the Mohegan Sun construction site. (DeRay Dep. at 69.)

52.  Defendant Accarpio approached DeRay on or about February 5, 2003 and told DeRay that he had to wear the harness because it was Otis' policy or he could be fired. (DeRay Dep. at 70-71.)

53.  DeRay continued to refuse to wear the safety harness while operating an elevator on the Mohegan Sun construction site. (DeRay Dep. at 68-69.)

54.  On February 6, 2003, Otis issued a termination letter DeRay for his failure to wear the safety harness on the Mohegan Sun construction site. (DeRay Dep. at 71; DeRay Dep. Ex. 7.)

55.  The termination letter read, "[b]ecause you continue to violate the Otis safety policy regarding harnesses on construction sites, I have no alternative other than to terminate your employment with Otis Elevator effective immediately." (DeRay Dep. Ex. 7.)

56.  On February 12, 2002, DeRay had a secretary of IUEC Local 91 type a document addressed to the "National Arbitration Committee." (DeRay Dep. at 73-74; DeRay Dep. Ex. 8.)

57.  In the February 12, 2002 document, DeRay refers to Article XXII Paragraph 4(e) of the Otis Agreement. (DeRay Dep. Ex. 8.) That provision is as follows:

> It is understood and agreed that prior to terminating an employee for unsatisfactory performance who is to be replaced under this paragraph or any other employee, the Company will give a written warning to the employee with a copy to the Business Representative in order that the employee be given an opportunity to improve his work performance. Such a termination may be submitted as a grievance to the National Arbitration Committee as provided under Article XV as a final source of appeal.

(DeRay Dep. Ex. 4 at 87; Koerbel Aff. Ex. 1 at 87.)

54. DeRay did not seek the assistance of Ronald Koerbel prior to drafting the February 12, 2002 document. (DeRay Dep. at 81; Koerbel Aff. ¶ 22.)

55. On February 22, 2002, DeRay had a document entitled "Notice of intent to file lawsuit" prepared. (DeRay Dep. at 82.)

56. In preparing the February 22, 2002 document, DeRay indicated his intent to sue Defendants Dominic Accarpio and Ronald Koerbel, as well as Defendants Otis, IUEC Local 91 and IUEC. (DeRay Dep. at 82-83.)

57. In preparing the February 22, 2002 document, DeRay indicated his intent to sue these Defendants on the same grounds as those set forth in the complaint in this matter. (DeRay Dep. at 84.)

58. On March 14, 2002, there was a meeting between Earnest Lowe, who was the Labor Relations Representative of Otis and Dominic Accarpio, who was the Business Manager of IUEC Local 91. (Koerbel Aff. ¶ 21; Amended Response of Defendant Ron Koerbel to Interrogatories Portion of Plaintiff's First Set of Interrogatories and Request of Production ["Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories"], Interrogatory Answer No. 2; Amended Response of Defendant International Union of Elevator Constructors, AFL-CIO to Interrogatories Portion of Plaintiff's First Set of Interrogatories and Request of Production ["Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories"], Interrogatory Answer No. 2 )

59. The March 14, meeting had been called to address grievances that were properly filed and processed to the Written Step One. (Koerbel Aff. ¶ 21.)

60. Prior to this meeting, Ronald Koerbel had not received any grievance on behalf of John B. DeRay that had been properly filed or processed to Written Step One. (Koerbel Aff. ¶

21; Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2; Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2.)

62. At this March 14 meeting, Earnest Lowe informed Koerbel and Accarpio that he received a letter signed by John B. DeRay protesting his termination for failing to comply with Otis' safety policy regarding the wearing of harnesses. (Koerbel Aff. ¶ 22.) Earnest Lowe showed a copy of a February 12, 2002 letter signed by John B. DeRay, addressed to the National Arbitration Committee. (Koerbel Aff. ¶ 22; Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2; Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2.)

62. At the March 14 meeting, Dominic Accarpio explained that DeRay had received several warnings about his refusal to wear a harness on a construction site in accordance with Otis' safety policy. (Koerbel Aff. ¶ 23.) Accarpio further explained that he went to the job site and instructed all mechanics or helpers operating elevators—including DeRay—to wear the safety harness. (*Id.*) Accarpio stated that DeRay responded by saying he was not going to wear the harness no matter what Otis or Accarpio said. (*Id. See also* Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2; Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2.)

63. Based upon this information, in which DeRay was intentionally refusing to comply with Otis' safety policy, his supervisor's directives and the Business Manager's instructions, Koerbel agreed with Otis and Accarpio that the dismissal was just. (Koerbel Aff. ¶ 23; Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories,

Interrogatory Answer No. 2; Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2.)

64. On May 23, 2002, DeRay and another IUEC Local 91 member, Judd White, went to the offices of IUEC Local 91 for a meeting with Dominic Accarpio. (DeRay Dep. at 83; Koerbel Aff. ¶¶ 26-28; Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 1; Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 1.)

60. At that meeting, DeRay stated that he was not going to wear a safety harness to operate an elevator. (DeRay Dep. at 84; Koerbel Aff. ¶¶ 28; Amended Response of Defendant Koerbel to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2; Amended Response of Defendant IUEC to Plaintiff's First Set of Interrogatories, Interrogatory Answer No. 2.)

61. DeRay filed the complaint on December 4, 2002. (DeRay Dep. at 9.)

Respectfully submitted,

By: _____
Robert Matisoff (Bar No. ct05002)
Keith R. Bolek (Bar No. ct24482)
**O'DONOGHUE & O'DONOGHUE**
4748 Wisconsin Avenue, N.W.
Washington, D.C. 20016
(202) 362-0041 – Telephone

By: _____
J. William Gagne (Bar No. ct02126)
**J. WILLIAM GAGNE & ASSOCS.**
1260 Silas Deane Highway
Wethersfield, CT 06109
(860) 522-5049 – Telephone

Attorneys for Defendants International Union of Elevator Constructors, AFL-CIO and Ronald Koerbel

109318_1