# Index

Court

Ex 1    Elevator Constructor

Ex 2    Grievance Dec 10

Ex 4    On Construction Jan 28

Ex 3    Safty Philosphy + Policy

Ex 5    Discipline Procedure

Ex 6    CBA

Ex 7    Responces to Int Dominic

Ex 8    Decision Appeals Referee

Ex 9    Interrogatorys Larson + Hastings

Ex 10   Otis Safty manual 4.6 Horseplay

Ex 11   Minutes of E Board

Ex 12   Hand written Notes

Ex 13   Letter May 30 Labor Relations

Ex 14   Letter Ernest Lowe June 4

Ex 15   unofficial Report

Ex 16   unemployment hearing Under oath tape
        The original was turned over to Att
        Gagne and he still has it.



# Editor's Corner



**James H. Chapman, Jr.**
*Assistant to the General President and Editor*

In upcoming journal articles I will be including quotes taken from most safety handbooks used by your employers. We must work safely to ensure that all of our Brothers and Sisters return home safely to their families.

## FALL PROTECTION

### General Requirements

Fall protection is required when a worker is exposed to a fall hazard — working more than 6 ft (1.8 m) above a lower level and an opening more than 10 in. (254 mm). Only company-approved lifelines, shock-absorbing lanyards and body harnesses shall be used.

Lifelines shall be protected against being cut or abraded. Only synthetic or wire rope shall be used for lifelines.

Lifelines shall be installed before working in the hoistway/wellway and shall run the full length of the hoistway/wellway in one piece, and be so arranged to permit tying off before entering the hoistway/wellway.

* Only one worker is permitted on a vertical lifeline, and that lifeline shall have a breaking strength greater than 5,000 lbs (2268 kg) after it has been attached to the anchorage point.

* Shock-absorbing lanyards shall be anchored to the lifeline and shall be above shoulder height so that any fall shall not exceed 6 ft (1.8 m). Lanyards shall be connected to a vertical lifeline by means of a rope grab. The lanyard shall not be attached directly to the lifeline. **Lifelines, harnesses and shock-absorbing lanyards subjected to impact loading shall be immediately removed from service. They shall be eliminated and destroyed for employee safeguarding.**

* Tying to the hoistline is prohibited. Proper rope grab shall be used

Due to the possibility of entanglement, a personal fall-arrest system shall never be used on top of a completed, operational elevator car unless there is a fall hazard and the work being performed requires the lockout tagout procedure.

Brothers and Sisters please take time to work safe. If there is an unsafe condition report it to your superintendent before continuing work. Find other work that may need to be done until the unsafe condition is corrected.
PLAINTIFF'S EXHIBIT
CASE NO. 2139
EXHIBIT NO. 1

OCTOBER 2003

DATED: DECEMBER 10TH, 2001

TO: THE DESIGNATED COMPANY REPRESENTATIVE WHO SHALL BE DISCUSSING THE GRIEVANCE BROUGHT TO THE ATTENTION OF RUSS LARSON DUE THE FACT THAT THE GRIEVANCE CENTERS AROUND MR. LARSON.

FROM: JOHN DERAY HEREBY KNOWN AS THE GRIEVANT AS WRITTEN IN ARTICLE XV "ARBITRATION" PORTION OF THE OTIS ELEVATOR COMPANY AGREEMENT WITH INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS.

TO DATE: THE ORAL STEP, PAR. 2. THE GRIEVANT, JOHN DERAY, CONFRONTED SUPERVISOR, RUSS LARSON WITH THE GRIEVANCE ON DECEMBER 4TH OR 5TH OF THE YEAR 2001.

LOCAL BUSINESS AGENT IS ALSO AWARE OF THE CIRCUMSTANCES OF THE GRIEVANCE WHICH IS TWO-FOLD.

1ST – ALLEDGED POLICY
2ND – SUPERVISORY VIOLATION OF 0 TOLERANCE.

REQUEST: PROVIDED FORMS REQUIRED BY PART. 3 OF THE AGREEMENT.

OTIS ELEVATOR COMPANY EMPLOYEE JOHN DERAY

PLAINTIFF'S EXHIBIT
CASE NO. CV 2139
EXHIBIT NO. 2

*Recieved by Jeff Hastings*

RE: AN INCIDENT THAT INVOLVES SUPERVISOR, RUSS LARSON, WHICH TOOK PLACE AT APPROXIMATELY 4:00 P.M. ON NOVEMBER 27TH, 2001 AT THE OTIS ELEVATOR CONSTRUCTION OFFICE AT THE MOHEGAN SUN CASINO.

BRIEF HISTORY: JOHN DERAY WAS HIRED BY OTIS TO OPERATE ELEVATORS AT THE BUSHNELL THEATER. THERE WERE NO HARNESS REQUIREMENTS MENTIONED OR ISSUED TO OPERATE THE ELEVATORS AND OTIS SAFETY PERSONELL VISITED THE JOB ON A REGULAR BASIS. I WAS THEN SENT TO THE MOHEGAN SUN CASINO TO INSTALL A GALISBE HOIST AND THEN I WAS REQUIRED TO WEAR A HARNESS FOR OBVIOUS REASONS. I WAS TRANFERRED BACK TO THE BUSHNELL THEATRE FOR A TIME AND THEN SENT BACK TO THE MOGEHAN SUN CASINO TO OPERATE AN ELEVATOR AND I WAS TOLD I HAD TO WEAR A HARNESS TO OPERATE A CAR AN THAT SUCH WAS THE OTIS POLICY ON ALL CONSTRUCTION JOBS. I KNOW THAT TO BE UNTRUE; THEREFORE I REFUESED TO WEAR A SENSELESS PIECE OF EQUIPMENT TO OPERATE AN ELEVATOR CAR. I OPERATED SEVERAL DAYS HARNESS FREE AND BROUGHT THE MATTER UP TO MY BUSINESS AGENT, WHO TOLD, ME AT AN EXECUTIVE BOARD MEETING, THAT HE AGREED WITH MY POSITION AND WOULD STRAIGHTEN THE MATTER OUT. EVENTUALLY I WAS ORDERED TO WEAR OR WALK SO I WALKED AND CALLED OUR BUSINESS AGENT, WHO TOLD ME TO GO BACK, WEAR THE HARNESS AND HE WOULD STRAIGHTEN IT OUT IN A COUPLE OF DAYS, BUT TO WEAR THE HARNESS BECAUSE IT CONCERNED A DEEPER DISPUTE WITH THE OPERATING ENGINEERS. I WAS GIVEN A HARNESS SUIT UNIFORM BY PAUL MCDONALD., BECAUSE IT WAS TO SMALL FOR HIM. I WORE THE SUIT FAITHFULLY BUT IN PROTEST WHILE HAVING CONSTRUCTION WORKERS AND ELEVATOR PERSONNEL TUG ON THE HOOK AND SOME OF THEM IRRITATED ME. THE BUSINESS AGENT WAS UNABLE TO CORRECT THE ISSUED AND I WAS CONFORMING TO THE POLICY EVEN THOUGH I VIEWED THE POLICY AS UNNECESSARY CONTROLL. RUSS LARSON WAS HAPPY THAT I WAS CONFORMING AND JOKINGLY OFFERED TO ORDER ME A STATE OF THE ARTS TOOL BOX BECAUSE I WAS WEARING MY HARNESS. I KNEW HE WAS JOKING SO I RESPONDED BY SAYING "THANK YOU FOR BEING SO GENEROUS. I ALSO COULD USE ONE OF THOSE BAND SAWS," RUSS REPLIED "YOU GOT IT" AS I CLOSED THE ELEVATOR DOOR. APPROXIMATELY A WEEK PASSED WITHOUT INCIDENT UNTIL NOVEMBER 27TH, 2001, AT APPROXIMATELY 4:00 P.M., WHEN I WENT TO THE CONSTRUCTION OFFICE AFTER WORK. I WANT THIS PICTURE TO BE AS WELL UNDERSTOOD AS POSSIBLE BY WHOEVER WILL FOLLOW UP ON THIS GRIEVANCE, THEREFORE, I BEGIN WITH ME WALKING INTO THE OFFICE.

1ST – COMMENT DAN BINETTE TO ME "WHAT ARE YOU DOING HERE?"

MY REPLY, JOKING, WELL I JUST SAW THAT RUSS WAS HERE SO I STOPPED IN TO SEE IF MY ORDER HAD COME IN. THE EXACT WORDING MAY NOT BE EXACT BUT I WOULD BE WILLING TO TAKE A LIE DETECTOR TEST IN ORDER TO SUBSTANTIATE THE VALIDITY OF THIS ALLEGED GRIEVANCE. I WROTE IT DOWN TO THE BEST OF MY RECOLLECTION FOLLOWING THE JOKE THAT RUSS TURNED INTO A CONFRONTATION.

RUSS WAS SITTING AT HIS DESK AND HE TURNED TO ME AND SAID " I AM OR WERE LETTING YOU WORK HERE AS LONG AS YOUR WEARING YOU HARNESS" AS HE SORT OF TURNED TO THE AREA OPPOSITE MY POSITION AS I WAS IN THE ENTRANCE.

RUSS THEN WENT ON WITHOUT PAUSING, TAKE OFF YOU HARNESS AND I'LL FIRE YOU. BRIEF PAUSE AND THE ROOM WAS SILENT AND HE CONTINUED, THEN I CAN GIVE YOUR JOB TO ANGEL AND HE TURNED TO ANGEL RODRIQUES AND SAID "ANGEL WOULDN'T YOU LIKE TO TAKE OR HAVE JOHN'S JOB AN RUN THE ELEVATOR FOR MECHANICS WAGES? ANGLE REPLIED " YEAH" A SINGLE WORD AND I LEFT DISARRAYED, SPEECHLESS, BOTHERED AND BEWILDERED. I FELT LIKE '0' TOLLERANCE MUST NOT APPLY TO SUPERVISORS, AND SUCH A RESPONSE SHOULD BE RETRACTED OPENLY DUE TO POOR TASTE. THAT CONFRONTATION UNDER THE CIRCUMSTANCE, ATE AT ME AND THEN I FINALLY DECIDED THAT THIS VIOLATION OF HUMAN DIGNITY, RESPECT AND '0' TOLLERANCE AND MUST BE ADDRESSED BY SUPERVISORS, AS WELL AS EMPLOYEES. SO I CAME TO WORK WITHOUT THE HARNESS WITHOUT INCIDENT THE FIRST DAY, THE SECOND DAY RUSS MCKENZIE AND JEFF HASTINGS WERE THERE, THEY SAID NOTHING AS I BROUGHT THEM TO THEIR DESIGNATED FLOOR EXCEPT RUSS WHO GAVE A GESTURE TO HIS HARNESS CALLING TO MY ATTENTION THAT I WAS NOT WEARING ONE BY HIS JESTURE ALONE.

A FEW HOURS PASSED AND THE SUPERVISORS WERE AGAIN TRANSPORTED IN MY ELEVATOR TO ANOTHER DESTINATION AND RUSS SAID "GET YOUR HARNESS ON", I'LL BE CHECKING ON YOU AT NOON, BUT HE DIDN'T BECAUSE I THINK HE KNEW IT WAS A BATTLE OF WILLS WHICH HE HAD ALREADY CONFONTED ME ON NOVEMBER 27TH, FOR NO MATERIAL REASON. HIS ORDERS ARE OF CONTROL NOT REASON AND HE IS NOT MY GOD NOR IS MONEY MY COMMANDER. I WORK HARD FOR MY MONEY SO YOU BETTER TREAT ME WITH DIGNITY AND RESPECT OR TAKE THE JOB AND RESPECTFULLY FOLLOWING THE SONG. SHOVE IT.

THE FOLLOWING DAY RUSS CAME IN AND I CHOSE TO CONFRONT HIM IN THE OFFICE ALONE. DAN BINETTE CAME IN ABOUT 2 OR 3 MINUTES LATER. DAN, IN MY OPINION, IS NOT A DEPENDABLE SOURCE OF HONESTY. THEREFORE I MAY BE DAMNED IF I DO AND DAMNED IT I DON'T, DEPENDING ON THE DEPTH OF THE INVESTIGATION. I WAS ANGRY BUT COMPOSED ENOUGH TO CONFRONT RUSS WITH THE (WHY) MY ANGER WAS DUE TO THE FACT THAT THE ISSUE SHOULD HAVE BEEN MOOTED WHILE I WAS FAITHFULLY CONFORMING, BUT RUSS CHOSE TO RUB SALT INTO THE WOUND. I WAS NO LONGER WILLLING TO CONFORM TO THE WEARING OF A UNNECESSARY ALLEDGE REQUIREMENT THAT SERVED NO USEFUL PURPOSE AND PROVIDED A FEW IRRITABLE CONSTRUCTION WORKERS AN IRRISTABLE URGE TO TUG ON.

I DID REQUEST OF RUSS TO SEE THE HARNESS REQUIREMENT, BUT TO DATE HE HAS FAILED OR REFUSED TO PRODUCE ANYTHING WRITTEN.

MY ALLEGATIONS OF HIS VIOLATION OF "0" TOLLERANCE ARE SUCH THAT I FELT HE WAS OR SHOULD HAVE BEEN AWARE THAT SUCH A CONFRONTATION WOULD CAUSE REBELLION. RUSS LARSON KNEW AS DID EVERY OTIS EMPLOYEE, ON THE JOB, THAT I WAS CONFORMING DUE TO A UNION SHORTAGE OF MAN POWER. THE USEFUL HARNESS RULE IS ABSENT IN MY OPINION WHEN OPERATING AN ELEVATOR CAR.

I WAS CREATED WITH A BODY AND A MIND AND AT THE AGE OF 60 I CAN BOAST OF NEVER A WORKERS COMPENSATON CLAIM.

I KNOW INSTINCTIVELY WHEN AN WERE TO HOOK UP.

THOSE OF YOU WHO ARE DISTINED BY AGREEMENT TO ADDRESS THIS GRIEVANCE SHOULD AND I REQUEST THAT YOU FOLLOW UP INVESTIGATE AND LEAVE NO STONES UNTURNED.

IF I WERE A POLICY WRITER, I WOULD INCORPERATE THE LIE DETECTOR TEST IN ORDER TO SETTLE MATTERS SUCH AS THIS.

SINCERELY,

*[signature: John DeRay]*

JOHN DERAY


CC: DOMINIC ACCARPIO, BM, LOCAL 91
    JEFF HASTINGS, OTIS SUPERVISOR

# CLARIFICATION OF INTENT

The content of this

Otis Employee Safety Handbook

**is not intended to describe**

**a process for every task or situation**

**that you may encounter.**

In the event that you are faced with a task

or situation that does not allow you to use one

of the descriptions found in this handbook,

contact your supervisor and

proceed to do a

**JOB HAZARD ANALYSIS.**

\* Denotes areas of significant change.

## OTIS EMPLOYEE SAFETY HANDBOOK (2000)
### TABLE OF CONTENTS

OTIS SAFETY & ENVIRONMENTAL POLICY .................. 1
SAFETY PHILOSOPHY .................................................. 2
INTRODUCTION ............................................................. 3
1.0   EMPLOYEE RESPONSIBILITY ............................. 4
      1.1   MECHANIC'S RESPONSIBILITY ................... 4
      1.2   REPORTING ACCIDENTS ............................. 5
2.0   SAFETY INSPECTIONS ........................................ 6
      2.1   DAILY .............................................................. 6

## SAFETY PHILOSOPHY

Safety at Otis is a condition of employment. Employees are expected to accept their responsibility for safety when they join the company. This includes their personal safety and that of the people and facilities with which they work.

It is the responsibility of this company to enforce their safety procedures. Failure to comply with Otis Safety rules may result in disciplinary action.

Safety is part of the planning process, and if good judgment is applied, accidents will be prevented.

Safety is a partnership. We welcome and encourage your input. Any time you have a question or suggestion that would improve safe practices, please forward these to your safety committee or your immediate supervisor.



# EMPLOYEES RESPONSIBILITY FOR OCCUPATIONAL SAFETY AND HEALTH PROGRAM

**1.0  Employees Responsibilities: Mechanic/Helper**

1. Following prescribed safety procedures and work practices in performance of their assigned task.
2. Using all safety equipment provided when performing their work.
3. Promptly reporting all accidents that occur in the course of their work assignments.
4. Bringing unsafe conditions to the attention of supervisory personnel.

**1.1  Mechanic**

On an Otis job, a Field Associate is normally assigned the responsibility for seeing that the work is performed in accordance with the work-order. Depending on the type of work being done, they may be; a Foreman, Mechanic in Charge, a Team Mechanic, or a Maintenance Mechanic. In fulfilling this additional responsibility, they must take all practical steps to be sure that the work is performed with due regard for safety and environment — safety for their fellow workers, safety for the public, and safety for themselves, and for the property of the company and others. To keep operations safe, the following are some of the principal requirements:

1. Be sure all equipment and job-site areas where Otis work is performed are routinely inspected to find any unsafe conditions which could cause injuries or property damage.
2. Identify and eliminate any unsafe conditions or practices that are under the control of the Company.
3. Whenever the unsafe practices of workers of other trades could cause injury to Otis associates or damage Otis property, immediately take steps to safeguard the associates or property, report such practices verbally and in writing to (1) those responsible at the job-site and (2) appropriate Otis supervision.
4. When it is the responsibility of others to correct unsafe conditions notify the Building Owner, General Contractor or responsible individual at the job-site and appropriate Otis Supervision that such action is required.
5. Otis work or storage areas accessible to the public must have, restrictive barricades, warning signs, lights, etc.
6. Keep unauthorized persons out of areas where work is being performed or Otis material is stored.
7. In all physical operations, particularly service, be sure when removing a component that you anticipate the effect of removal on the entire elevator system. As an example, when renewing packing on a hydraulic elevator, the platform and cab must be shored up.
8. Be sure that all associates are made aware of the hazards in the type of work to be performed. A job hazard analysis before starting the work may prevent an accident.
9. Don't allow any employee to work when their ability or alertness is so impaired by fatigue, illness, physical or psychological causes that they might expose themselves or others to injury.
10. Always determine the whereabouts of each person in the work group before everyone leaves the job-site for meals, during a site evacuation, at quitting time or for any other reason.
11. Never, under any circumstances, allow Company equipment to be loaned to or used by anyone other than Otis personnel, without written approval of the Supervisor or Superintendent.
12. Never, under any circumstances, allow non-Otis employees or materials to be transported on incomplete installations, where a temporary or final acceptance or release has not yet been obtained.
13. Ensure that all Otis Associates adhere to all Safety and Environmental rules.

**1.2  Reporting Accidents**

Report all accidents to your supervisor immediately, no matter how trivial. If your supervisor is unavailable notify your office or *Otisline*.

### 15.0 Fall Protection

Fall protection shall be provided for and used by employees who work at an elevated level of six or more feet (two or more metres) or where other hazardous conditions exist, for example, working over machinery or moving equipment, which may present an additional hazard if a fall were to occur.

A fall hazard is defined as a space 12"x12" or larger. Fall protection must be used when working within 12" of a 12"x12" space on a car top or when working within a 72" of 12"x12" space at all other times.

Elimination of fall hazards should always be our first consideration and our preferred option. If the fall hazard cannot be eliminated then a guardrail system must be used as the primary protection against falls. If guardrails are not feasible, then alternate means of protection must be provided and used, such as, the use of a safety harness with shock absorbing lanyard, covering all holes or openings, the installation of safety nets and/or other equivalent safeguards.

The use of a safety harness and lanyard requires the following equipment minimums:

1. Otis approved, full body harness or fall protection uniform.



-51-                                                                 7/98

Internal Correspondence   Otis
A United Technologies Company

NKG Office
North American Area
242 Pitkin St, East Hartford Connecticut 06108   USA

Email: russ.larson@otis.com
Tel:  (860) 384-0451
Fax:  (860) 289-1875

January 28, 2002

TO:      All Construction Personnel

FROM:    Russ Larson

Cc:      Jeff Hastings, Dom Acarpio

SUBJ:    Construction Harness Policy

This is a reminder of the Otis safety harness policy for construction employees. The Otis Employee Safety Handbook states on page 53 that

"On construction, a safety harness or fall protection uniform and shock absorbing lanyard shall be worn at all times."

Exceptions:

A) The harness or fall protection uniform does not have to be worn if an Otis associate is attending a meeting at a site construction office and no other work activities are involved.

B) The project will no longer be considered a construction site when the contractor has obtained an occupancy permit.

C) All elevators / escalators have been placed on final acceptance.

D) A "handover" to Service has been completed and construction work is 100% completed on all elevators / escalators.

We will be specifically covering this topic at safety meetings for construction personnel during the month of February. Please contact me if you have any questions regarding this policy.

Harness policy.doc


PLAINTIFF'S EXHIBIT
CASE NO. 2139
EXHIBIT 4

## OTIS SAFETY DISCIPLINE PROCEDURE
## FOR ALL EMPLOYEES

| IN VIOLATION OF: | Verbal Warning (Documented) | Written Warning with Citation | Suspension with Citation | Discharge with Citation | Salaried I.C. Impact |
|---|---|---|---|---|---|
| Lockout / Tagout | | | X | X | X |
| Fall Protection | | | X[1] | X | X |
| GFCI / Assured Grounding | | X | X | X | X |
| Personal Protective Equipment | X | X | X | X | X |
| Methods and Tools | X | X | X | X | X |
| Haz-Com /Environmental | X | X | X | X | X |
| All Other Items | X | X | X | X | X |

X's represent the minimum starting point that discipline must be taken

### FIELD HOURLY IUEC REPRESENTED ASSOCIATES

Use the above chart to determine minimum discipline for violations. Supervision must consider the seriousness of the violation(s) to help determine what disciplinary action to take beyond the minimum required. It is recommended that the applicable Field Employee Relations Manager or NAO Labor Relations be contacted for consultation in advance of either a suspension or discharge.

### MANAGEMENT/SUPERVISORY ASSOCIATES
(Vice President, Regional General Mgr., Field Operations Mgr., Location Mgr., Service Supv., Construction Supt.)

By using the above chart to determine the various disciplinary steps, managers' and supervisors' roles in safety violations are evaluated using the following criteria:

**Insufficient Training**
Was the violation caused by or contributed to because of insufficient training of the individuals involved?

**Equipment not issued/Used or wearing not enforced**
Did supervision provide appropriate equipment and have they consistently enforced the use of this equipment?

**Insufficient Safety Documentation**
Were appropriate records created and maintained in employee's file documenting issuance of equipment, dates and types of training?

**Unsafe Work Environment**
Were the employees being asked to work in an unsafe situation that could have been corrected?

Additionally, incentive compensation pay will be reduced or eliminated as part of any incident involving the suspension or discharge of the manager/supervisor.

NOTES:
* In all cases where a violation is found, the employee must be reinstructed in how the rule should have been followed. This reinstruction should then be documented.

[1] Automatic two day suspension for violation

PLAINTIFF'S EXHIBIT
CASE NO. 2139
EXHIBIT NO. 5

Company does not have a regular work force, the Company shall have the right to transfer mechanics temporarily on a one-to-one basis in the case of two (2) man jobs up to a maximum of three (3) such jobs at any given time. It is understood that the foregoing limitations shall not be applicable where there are no qualified mechanics available in the local union. Mechanics temporarily transferred under the above provisions may remain in the area only until completion of their work on the particular job for which they have been transferred.

Otis and the IUEC shall mutually decide upon what is a regular work force as used in this Par. 3 and that decision shall become incorporated in and a part of this Agreement.

**Par. 4.** Where the Company is opening a new office in one local union's jurisdiction they may permanently transfer one mechanic from the jurisdiction of another local union to start the new office provided they have advised the Business Representative in advance of the transfer. The Company may permanently transfer an employee from one local union to work in the jurisdiction of another local union subject to the following conditions:

(a) Prior notice shall be given to the International Union.

(b) The Company shall consider the following factors in reaching a decision to transfer such an employee:

1. The availability of qualified personnel in the other local union.

2. The business necessity for such a transfer and other relevant considerations.

(c) The Company shall not permanently transfer any employee for the purpose of circumventing an expense agreement.

(d) Any dispute concerning such a transfer shall be subject to the grievance and arbitration procedure herein.

(e) It is understood and agreed that prior to terminating an employee for unsatisfactory performance who is to be replaced under this paragraph or any other employee, the Company will give a written warning to the employee with a copy to the Business Representative in order that the employee be given an opportunity to improve his work performance. Such a termination may be submitted as a grievance to the National Arbitration Committee as provided under Article XV as a final source of appeal.

## ARTICLE XXIII

### Scope and Terms of Agreement

**Par. 1.** This Agreement shall be binding upon the Company, the IUEC and its local unions

PLAINTIFF'S EXHIBIT
CASE NO. CV 2139
EXHIBIT NO. 6

Union and the Otis Representative may utilize in negotiating changes to and resolving disputes over local travel time and travel expense agreements.

All parties shall continue to work under the existing local travel time and local travel expense agreement for thirty (30) days from the date that Otis and the IUEC are notified that the parties have reached an impasse. The General President, IUEC and the Director, Industrial Relations, or their designees, may at their discretion extend the present Agreement for one additional thirty (30) day period.

## ARTICLE XIV

### Strikes and Lockouts

**Par. 1.** It is agreed by both parties to this Agreement that so long as the provisions herein contained are conformed to, no strikes or lockouts shall be ordered against either party. It is understood that this Paragraph shall be applied and construed consistent with the provisions of Article IV, Par. 11 concerning Grievance and Arbitration procedure.

**Par. 2.** No strike will be called against the Company by the Union unless the strike is

58

approved by the International Office of the International Union of Elevator Constructors. Sufficient notice shall be given to the Company before a strike shall become effective. Except in the case of Contract Service Work as specified in Article IX of this Agreement, work stoppages brought about by lawful picketings or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.

**Par. 3.** In the event of a strike, work stoppage or lockout affecting Mechanics and Helpers on New Construction or Repair Work, men working on Contract Service shall not be affected by such strike, work stoppage or lockout, and the Union will supply competent men to the Company to do all work covered under Contract Service whether such men are continuously employed in this work or not prior to the strike, work stoppage or lockout.

## ARTICLE XV

### Arbitration

**Par. 1.** Any difference or dispute regarding the application and construction of this Agreement, shall be referred to as a "grievance"

59

and shall be resolved under the following procedure. Both parties commit to making an earnest effort to resolve differences in accordance with the procedure outlined below:

**Par. 2. Oral Step.** Any employee, local union, or the Company with a grievance (hereinafter called the "grievant"), shall discuss the grievance with the designated Company Representative (or Local Union Business Representative) within ten (10) working days after the cause of the grievance is known or should reasonably have been known. The Company shall designate to each local union the Company's Representative(s) for the purpose of responding to grievances at this step. If the grievance is initiated by an employee, the Local Business Representative shall be present during the discussion.

Within three (3) working days after the above discussion, the Company's Representative shall notify the employee and the Local Union Business Representative of his disposition of the matter.

The Local Business Representative shall similarly respond to the Company's grievance.

**Par. 3. Written Step One.** If the issue remains unresolved after the conclusion of the Oral Step, the grievant, within ten (10) working

60

days of the conclusion of the Oral Step, may submit in writing on provided forms a brief statement of the grievance, including the Article and paragraph of the Agreement allegedly violated (if known), and the remedy requested.

Within fifteen (15) working days after the written grievance is received by the Company (or the Union), a meeting will be held to discuss the grievance. The Company shall be represented by the Regional Manager, Field Employee Relations or his designee and the designated Company Representative described in Paragraph 2. The union shall be represented by the IUEC Regional Director or other Representative designated by the General President and the Local Business Representative described in Paragraph 2.

At the meeting (or any continuation thereof agreed to by the parties) the Company (or the Union) shall give its written answer to the grievance on the provided form. Within ten (10) working days of that disposition, the Company or the Union shall indicate on the grievance form whether it appeals therefrom. If the grievance disposition is not appealed, it shall be final and binding on all parties.

**Par. 4 Written Step Two.** If the grievance is appealed it shall be placed on the agenda of a

61

scheduled meeting of the National Arbitration Committee. The Company shall be represented by the Director, Industrial Relations or his designee and a panel of two (2) additional Company Representatives. The Union shall be represented by the General President or his designee and two (2) additional representatives.

The National Arbitration Committee shall meet once per calendar quarter. Each party shall submit an agenda not less than seven (7) working days prior to the meeting.

The Director, Industrial Relations or his designee (or the General President, IUEC or his designee) shall render a disposition of the grievance in writing at the National Arbitration Committee Meeting. If the grievance disposition is accepted, it shall be final and binding on all parties.

**Par. 5.** Impartial Arbitration. If the grievance is not settled by the National Arbitration Committee, the Union or the Company, within fifteen (15) working days of the Company's (or Union's) disposition as outlined in Paragraph 4, may appeal the grievance to impartial arbitration. Such appeal shall take the form of a letter to the Director, Industrial Relations (or the General President, IUEC).

**Par. 6.** The parties shall mutually agree upon the selection of an impartial arbitrator. If,

62

within fifteen (15) days, the parties are unable to agree on the person to be selected as arbitrator, the parties shall jointly request the Federal Mediation and Conciliation Service to submit a panel of seven (7) arbitrators. Upon the request of either party, up to two (2) additional panels may be requested. When notification of the names of the panel is received, the parties, in turn, shall have the right to strike a name from the panel until only one name remains. The remaining person shall be the arbitrator.

The arbitrator shall render his decision immediately upon the close of the record if the parties mutually agree otherwise the decision shall be rendered within thirty (30) days of the close of the record or the receipt of the briefs if the parties desire to file briefs. In an arbitration, either party may rely upon Articles in the Agreement other than those set forth in the original grievance form. The decision of the impartial arbitrator shall be final and binding on all parties.

**Par. 7.** It is understood that the arbitrator does not have the authority to add to, subtract from or modify in any way the provisions of this Agreement.

**Par. 8.** Grievances of the IUEC or Otis shall originate at Written Step Two by submission to the Director, Industrial Relations (or the

63

General President, IUEC). The grievance of an IUEC Regional Director shall be filed and processed beginning at Written Step One of the procedure.

**Par. 9.** Discharge Grievances - Expedited Impartial Arbitration. Recognizing the special nature of cases involving the discharge of an employee, the parties agree that such case(s) shall be handled as follows:

(a) Any discharge grievance not resolved at the Written Step One meeting may immediately be referred by either party to the Director, Industrial Relations or his designee and the General President, IUEC or his designee for their immediate review and discussion. Such grievance need not wait to be placed on the agenda of the scheduled National Arbitration Committee, but rather shall be discussed, either in person or by telephone, by the parties within ten (10) working days of the referral from Written Step One. The parties shall make an earnest effort to resolve their differences at this meeting, but failing such agreement, either party may request immediate, expedited impartial arbitration.

(b) Within ten (10) working days of a request for impartial arbitration by either party, the parties shall mutually agree upon the selection of an impartial arbitrator who shall be obliged to schedule a hearing at the earliest possible available date on his/her schedule where both parties are available to present their respective cases. The arbitrator shall hear the case. Post hearing briefs must be submitted within two (2) weeks of the conclusion of the hearing. The arbitrator shall render the award within two (2) weeks of the submission of briefs. Post hearing briefs may be waived by mutual agreement of the parties.

**Par. 10.** Compensation and expenses of the arbitrator shall be shared equally between the Company and the Union.

**Par. 11.** Any of the time limits contained herein may be mutually extended by the representatives of the parties. Failure to appeal the grievance within the time limits described above without mutual agreement shall be considered an abandonment of the grievance. If a grievance is not dispositioned within the above time limits, it shall be immediately processed to the next step of the procedure.

## ARTICLE XVI
## Jurisdictional Territory

**Par. 1.** The primary jurisdiction of any local union shall include only that territory in

to the observance of the holiday. The rate of pay for all work performed on paid holidays shall be at the regular overtime rate in addition to the holiday pay. Any unpaid holidays observed as provided in Par. 2 shall be without pay, but if worked shall be double time rate. No work except emergency work shall be performed on any holiday.

**Par. 6.** When a paid holiday falls on Saturday, it shall be observed on Saturday. When a paid holiday falls on Sunday, it shall be observed on Monday.

**Par. 7.** The Company shall not lay off or terminate an employee to circumvent holiday pay as provided herein.

## ARTICLE VII

### Construction Work

**Par. 1.** Construction work is hereby defined as erecting and assembling of apparatus as enumerated in Article IV and Article IV(A) of this Agreement, except general repairs and modernization as defined in Article VIII Par. 2 and 5. It is hereby agreed that all Construction Work as above defined shall be performed exclusively by Mechanics and Helpers.

24

**Par. 2.** It is agreed that the regular working day shall consist of eight (8) hours worked consecutively with an unpaid lunch period, between 6 A.M., and 5 P.M., five (5) days per week, Monday to Friday, inclusive. Hours of work at each jobsite shall be those established by the general contractor and worked by the majority of trades. (The above working hours may be changed by mutual Agreement as provided in Article XXVI.) If the general contractor shuts down operations on a day not recognized as a holiday under this Agreement, the Company shall make every effort to place the affected employees on other work for that day.

**Par. 3.** Work performed on Construction Work on Saturdays, Sundays and before and after the regular working day on Monday to Friday, inclusive, shall be classed as overtime, and paid for at double the rate of single time.

**Par. 4.** When any four (4) of the seven (7) Atlantic City Formula Trades obtain a six (6) hour day, the Union shall work a six (6) hour day, the working day to be between the hours of 6 A.M. and 5 P.M. When sufficient Mechanics and Helpers are not available, an eight (8) hour day shall be worked. Whenever a local union obtains a six (6) hour day under this paragraph, the local union and the

25