1      Q.    Let's turn to Article IV.  That's on page 4.  Are

2  you at page 4?

3      A.    Yes.

4      Q.    That article is entitled "Work Jurisdiction".

5  Correct?

6      A.    Yes.

7      Q.    Paragraph 1 reads, quote, It is agreed by the

8  parties to this agreement that all work specified in Article

9  IV shall be performed exclusively by elevator constructor

10  mechanics and elevator constructor helpers in the employ of

11  the company.  Unquote.  Is that correct?

12      A.    Yes.

13      Q.    Paragraph 2 then enumerates through various

14  subsections and following pages from subparagraph (a) through

15  subparagraph (v).  Is that correct?  Am I stating that

16  correctly?

17      A.    Oh, V?

18      Q.    V, yes, as in Victor.

19      A.    I thought you said E.  That's why it took me --

20      Q.    Okay.  So, if you will notice on page 8,

21  subparagraph (r), it reads, quote, The operating of temporary

22  cars.  Unquote.  Is that correct?

23      A.    Yes.

24      Q.    And that's within Article IV.  Correct?

25      A.    Correct.

1

2      Q.    (By Mr. Bolek)  Please take a moment to review it.

3      A.    Okay.

4      Q.    May I ask what you're referring to right now?

5      A.    I'm looking for a cover sheet that was on this

6  grievance.

7      Q.    Well, for the record, it's a three-page document.

8  At the top it says, "Regarding an incident that involves

9  Supervisor Russ Larson which took place at approximately 4:00

10  p.m. on November 27, 2001 at the Otis Elevator construction

11  office at the Mohegan Sun Casino."  Correct?

12     A.    Uh-huh.

13     Q.    Did you type this document?

14     A.    No.

15     Q.    Who typed it?

16     A.    The union secretary.

17     Q.    What is the name -- what is the secretary's name?

18     A.    Rose Small.

19     Q.    When did she type this?

20     A.    She typed it on December 10, 2001.

21     Q.    If you will, refer to the paragraph that begins

22  "Brief history."

23     A.    How far down?  Okay.  Yeah.

24     Q.    If you look at about where, I guess, the second

25  sentence begins, "I was then sent to Mohegan Sun Casino."

1    Q.    And we have already discussed that.    Correct?

2    A.    We have already what?

3    Q.    We have already discussed that?

4    A.    Yes.

5    Q.    The paragraph then reads, "I know that to be untrue,

6    therefore I refused to wear a senseless piece of equipment to

7    operate an elevator car."

8    A.    Correct.

9    Q.    And you had testified earlier that you refused to

10    wear the harness when you began to operate the temporary

11    elevators at Mohegan.    So, this is correct?

12    A.    Well, you're using the word temporary elevator and

13    I'm using elevator car.

14    Q.    Temporary car, elevator car.    But you didn't wear a

15    harness when you operated the elevator car.    Correct?    Let me

16    step back.    What was typed here is an accurate description?

17    A.    Not of every detail.    This is a grievance that I was

18    filing against Russ Larson for an incident that took place on

19    November 27th.

20    Q.    Well, we'll get to whether it's a grievance or not.

21    I am just going on what is typed here.

22    A.    Right.

23    Q.    Well, let's just then move on.    "I operated several

24    days harness free and brought the matter up to my business

25    agent who told me at an executivE Board meeting that he agreed

1    E Board meeting, do you make reference of it in Exhibit 5 in

2    the attachment, the second pages, 2, 3 and 4 of Exhibit 5?

3         A.    Do I make reference to the telephone calls?

4         Q.    Do you make reference to -- we have been talking

5    about a conversation for which you don't know how you spoke

6    with Mr. Accarpio, you don't know when it took place, you

7    don't know where it took place, but you know what was said.  I

8    am asking you, is that conversation reflected in Exhibit 5 in

9    a description of the incident that involves supervisor Russ

10   Larson?

11        A.    No.

12        Q.    You testified that you then spoke -- you spoke with

13   Mr. Accarpio at the executivE Board meeting.  Correct?

14        A.    Yes.

15        Q.    And then you went back to work at Mohegan Sun and

16   you wore the harness.  Correct?  Actually, strike that

17   question.  Why don't we just continue going down this Exhibit

18   5.  The next sentence reads, quote, Eventually, I was ordered

19   to wear or walk, so I walked and called our business agent who

20   told me to go back, wear the harness, and he would straighten

21   it out in couple of days.  End quote.  I guess that's the end

22   of the sentence.  Wait, no.  It goes on.  "But to wear the

23   harness because it concerned a deeper dispute with the

24   operating engineers."  So, after the executivE Board meeting,

25   you went back to Mohegan Sun and you operated a temporary

1    Q.    Were all of them completed?

2    A.    No.

3    Q.    Were all of them turned over to Mohegan Sun?

4    A.    No.

5    Q.    And, in fact, the elevator you were working on

6    wasn't turned over to Mohegan Sun.  Correct?

7    A.    Correct.

8    Q.    After the executive board meeting, you operated the

9    elevator without a harness?

10    A.    Correct.

11    Q.    And according to Exhibit 5, you were instructed to

12    wear or walk after the E Board meeting?

13    A.    Yes.

14    Q.    Someone instructed you to wear your harness or walk.

15    Correct?

16    A.    Russ Larson instructed that.

17    Q.    And you walked?

18    A.    Yes.

19    Q.    When you say you walked, you left the job site?

20    A.    No.  We went down to the casino part of the -- of

21    the casino and called Dominic.

22    Q.    When you say "we" --

23    A.    Okay.

24    Q.    You and who else?

25    A.    Judd White.

1          Q.    You went down to the casino part?

2          A.    Yes.

3          Q.    That was outside the limit of the construction

4    project.   Correct?

5          A.    Yes.

6          Q.    So, you left the temporary elevator?

7          A.    I am not going to, you know --

8          Q.    You left the elevator?

9          A.    Yep.

10         Q.    You left the construction site?

11         A.    Yes.

12         Q.    And what did you do?

13         A.    Called Dominic.

14         Q.    Is this the telephone conversation that you referred

15    to earlier with you and Judd White?

16         A.    And Dominic?

17         Q.    Yes.

18         A.    Yes.

19         Q.    And with regards to the temporary and non-temporary,

20    to your knowledge, is the elevator that you operated still

21    being used for construction work?

22         A.    Today?

23         Q.    Yes.

24         A.    No.

25         Q.    Now the construction project is over.   Correct?

NIZIANKIEWICZ & MILLER REPORTING SERVICES

1    A.    Correct.

2    Q.    And customers at Mohegan Sun are using that elevator

3    to the best of your knowledge?

4    A.    I know they are.

5    Q.    So, after you spoke with Mr. Accarpio, what did he

6    tell you?

7    A.    Told me to put the harness on and he would

8    straighten it out in a couple of days.

9    Q.    So, what did you do next?

10    A.    Followed his instructions.

11    Q.    So, you went back to the construction site and you

12    put a harness on?

13    A.    Actually, I was given a fall protection uniform.

14    Q.    Now, what is a fall protection uniform for the

15    record?

16    A.    Oh, it's in the safety manual.

17    Q.    Well, just --

18    A.    An alternative for a harness.

19    Q.    For purposes so that it's in the deposition

20    transcript, please describe a fall protection uniform?

21    A.    It's -- well, mine was a one-piece coverall with a

22    harness built in and a hook on the back.  There was several

23    different types.

24    Q.    And you wore the harness while operating the

25    elevator?

1    Q.    Did you give a reason?

2    A.    I think the reason is self-explanatory, but I did

3    tell him I wanted to see it in writing what he was referring

4    to.  And I wanted him to give me a practical reason as to why

5    I should have to wear a fall protection device to operate an

6    elevator when there was no place to hook up.

7    Q.    Well, you testified earlier that when you operated a

8    temporary elevator you were sometimes called off to help with

9    the installation of the unmanned lift?

10    A.    I testified that I was back and forth from Bushnell

11    to Mohegan Sun operating an elevator.  Sometimes at Bushnell

12    installing an unmanned lift and also operating elevators at

13    Mohegan Sun.

14    Q.    Okay.  And what I was referring to -- perhaps I

15    wasn't completely specific -- was while you were at Mohegan

16    Sun, you were operating an elevator and also at points helping

17    to install an unmanned lift?

18    A.    Yes.

19    Q.    And at that time, you wore the safety harness?

20    A.    No.  On construction, operating the -- I mean,

21    installing the unmanned lift, I had no problem.  I wore the

22    safety harness.  But I was not required at that time to wear

23    the safety harness to operate an elevator.

24    Q.    On what basis are you saying you were not required

25    to wear a safety harness?  Is there an Otis policy -- let me

1  be more specific.  Is there an Otis policy that says employees

2  operating elevators, temporary elevators, temporary cars or

3  whatever, are not required to wear a harness?

4       A.    Okay.

5       Q.    Yes or no.  Is there an Otis policy that states

6  employees operating elevators are not required to wear a

7  harness?

8       A.    Well, I think more specifically it says -- you're

9  referring to -- if you're going to, if you're operating a

10  temporary elevator.  A temporary elevator -- what is a

11  temporary elevator?

12      Q.    Forget about temporary elevator.

13      A.    All right.  Can we stay away from it?  Elevator.

14  Because I do have a problem with that.  I mean, you know, the

15  elevator that I was operating is now being operated by

16  passengers totally automatic.  So, it was not.  There was

17  nothing temporary about it.

18      Q.    Well, it was temporarily used for construction, was

19  it not?

20      A.    Yes.  It's temporarily used for construction, sure.

21      Q.    Okay.  Now, let's just -- well, forget temporary.

22  Is there an Otis policy that says employees who operate

23  elevators are not required to wear a harness?

24      A.    Not specifically, no.

25      Q.    Is there anything in any other work rules or other

1    policies of Otis or -- strike that.   Is there any other work

2    rule that provides that employees of Otis who operate an

3    elevator are not required to wear a harness?

4         A.    I guess so.

5         Q.    There is nothing else?

6         A.    No.   I guess there is -- there are rules that say

7    that elevator operators are not required to wear a harness.

8         Q.    You guess there are?

9         A.    Yes.

10        Q.    You don't know of any specific rule, do you?

11        A.    Well, I know I never was even issued a harness when

12   I operated the car at Bushnell.

13        Q.    Well, at Mohegan Sun you were required.   Correct?

14        A.    I was not required until an impulse came across Russ

15   Larson that he decided that we should wear -- that operators

16   would be required to wear a harness.

17        Q.    And that impulse, as you phrased it --

18        A.    Yeah.

19        Q.    -- was based on the Otis Safety Manual which said on

20   construction, all employees are required to wear a harness?

21        A.    On construction.

22        Q.    So, what is your definition of construction?

23        A.    Same as this manual right here refers to on page 24.

24        Q.    And you're referring to Exhibit 4, the Otis

25   agreement.   Just so it's clear in the record, you're referring

1    to Exhibit 4, the Otis agreement?

2    A.    Yes.

3    Q.    So, after November 27th, you didn't wear the harness

4    or fall protection uniform anymore?

5    A.    That's correct.

6    Q.    So, you reported to work the next day.  You operated

7    a temporary -- or you operated an elevator and you didn't wear

8    a harness.  Correct?

9    A.    I believe I did wear the harness for a couple of

10    days.

11    Q.    So, for --

12    A.    Following November 27th.

13    Q.    If you refer to page 3 of Exhibit 5, second full

14    paragraph towards the end, there is a sentence that begins,

15    "So I came to work without the harness without incident the

16    first day."

17    A.    Okay.  Page 3?

18    Q.    Page 3 of Exhibit 5.  First page being the cover

19    page, second page being the first page of the attachment,

20    third page being the second page of the attachment.

21    A.    Okay!

22    Q.    Paragraph begins, "Russ then went on."

23    A.    Okay.

24    Q.    Towards the end of that paragraph, there is a

25    sentence that begins, "So I came to work without the harness,

1    A.    Correct.

2    Q.    And then you said, quote, His orders are of control,

3  not reason, and he is not my God, nor is money my commander.

4  I work hard for my money, so you better treat me with dignity

5  and respect or take the job and respectfully following the

6  song, shove it.  Unquote.  Now, is that the reason why you

7  weren't wearing a harness?

8    A.    There were several reasons why I was not wearing the

9  harness.

10    Q.    Is that one of them?

11    A.    That's one of them.

12    Q.    Now, November 30th, which would be the following

13  day, you confronted Russ Larson?

14    A.    Yes.

15    Q.    What did you say to Russ Larson?

16    A.    What you have done on November 27th was turn a joke

17  into a confrontation in front of the entire crew.  Supervisors

18  should be aware of zero tolerance policies, and because of

19  what you did, it just goes against my grain to put this

20  harness on because it serves no purpose.  And until you can

21  give me in writing where Otis has a policy that requires union

22  workers to wear unnecessary equipment which is of no help to

23  them or is not for safety, I'm not going to wear this harness.

24    Q.    Were those your exact words?

25    A.    Pretty close.

1      Q.   Is there a classification of work in the elevator

2  constructors agreement with Otis for operating?

3      A.   Probably not.

4      Q.   So, why did you say operating if it's not a real

5  classification?

6      A.   I think your question was for the rest of the time

7  that you worked on construction.

8      Q.   For the rest of the time if you weren't working on

9  maintenance, modernization or repair, isn't the only other

10  work classification construction?

11     A.   Is that the only other?

12     Q.   That's what I'm asking you, yes.

13     A.   I -- you're probably right.

14     Q.   Okay.  So, when you were working at Mohegan Sun, you

15  weren't doing maintenance, were you?

16     A.   No.

17     Q.   You weren't doing modernization, were you?

18     A.   No.

19     Q.   You weren't doing repair, were you?

20     A.   No.

21     Q.   Okay.  If you were operating a temporary elevator,

22  would you consider that you were supposed to wear a harness?

23     A.   No.

24     Q.   So, you wouldn't wear a harness whether the elevator

25  was temporary or not temporary in your view?

1    A.    Well, in my view, temporary means something that is

2    not permanent.

3    Q.    Okay.  And if you were operating a temporary car,

4    would you wear a safety harness?

5    A.    If you're talking about the cars that Otis uses to

6    erect the rails and brackets and all, yes.

7    Q.    Those are the only cars that you consider temporary?

8    A.    Not necessarily the only cars.  I mean --

9    Q.    You knew there was a rule that required you to wear

10   a safety harness while operating an elevator for Otis on the

11   Mohegan Sun construction site, didn't you?

12   A.    No.  No.  I assumed that that was Russ Larson's

13   rule.

14   Q.    Assuming it was Russ Larson's rule, Russ Larson was

15   your supervisor, wasn't he?

16   A.    Yes.

17   Q.    You thought that was a silly rule, though, didn't

18   you?

19   A.    I thought it was a misinterpretation of a rule.

20   Q.    Did any other operator working for Otis at Mohegan

21   Sun agree with you?

22   A.    Everyone did.

23   Q.    Who?  Name one?

24   A.    Dan Binette.

25   Q.    Was Dan Binette working an elevator, operating an

1          MR. BOLEK:  Well, then we still have questions.

2

3          RECROSS-EXAMINATION BY MR. GAGNE:

4

5     Q.    This is Exhibit 13.  Have you seen those?

6     A.    Sure.

7     Q.    Are those are your works of art?

8     A.    My brother did the artwork.

9     Q.    Your brother?

10    A.    I'm just the --

11    Q.    And these were attached to your complaint?

12    A.    Yes.

13    Q.    I am, sort of, curious.  What is the purpose of

14   these being attached to the complaint?

15    A.    I think they are quite self-explanatory.  Here is

16   Elmer Fudd wearing a harness operating an elevator and Bugs

17   says, "What's da harness for?"  And there is nothing to hook

18   to or "But, Doc, you ain't hooked to nuttin'."  One is missing

19   here.  So, he draws a hook.  And this is on three.  He is

20   drawing a hook and you have Bugs Bunny's reaction to that.

21   Then Bugs says, "But, Doc, it can't save you."  And he says,

22   "You're beginning to make me vewy angwy wabbit."  And Bugs

23   says, "But, Doc, don't be a moron.  Everyone's laughing at

24   you.  Ha-ha.  I don't care.  It's powicy.  You cwazy wabbit."

25   And next it says, "Hold it, Doc.  I just got this final

Certificate Of Service

                              *These Excerpts*

Plaintiff John DeRay certifies that a copy of ~~this motion~~ was mailed by first class mail or
hand delivered on this **2ⁿᵈ** day of **December** 2003 to the following:

J William Gagne Jr.                    Edward J Dempsey, Esquire
Law Office of J William                United Technologies Corporation
Gagne Jr & Assoc, P.C.                 United Technologies Bldg
1260 Silas Deane Highway               Hartford, CT 06101
Wethersfield Ct 06109

               Keith R Bolek
               O'Donoghue & O'Donoghue
               4748 Wisconsin Avenue, NW
               Washington, DC 20016

               By the plaintiff John DeRay